Emma Olson, appellee, v. Adolph L. Fedde et al., appellants, Impleaded with Harold L. Camp et al., appellees.

107 N. W. 2d 663

Filed February 17, 1961. No. 34858.

Kenneth H. Dryden and J. Karr Taylor, for appellants.

Smith & Lebens and Claude D. Lutton, for appellee.

Heard before Simmons, C. J., Carter, Messmore, Yeager, Chappell, Wenke, and Boslaugh, JJ.

Messmore, J.

This is an action brought by Emma Olson as plaintiff, in the district court for Cass County, against Adolph L. Fedde and Mary Ann Fedde, husband and wife, Harold L. Camp, and all persons having or claiming any interest in and to a tract of land described in the plaintiff's petition. The purpose of the action was to quiet title to said tract of land in the plaintiff, to enjoin the defendants from entering upon or using the land, to

enjoin the defendants from claiming any right, title, or interest in and to such land, and for damages.

The trial court found generally in favor of the plaintiff and against the defendants; that the plaintiff was the owner of the real estate described in her petition; that she has been in actual, continuous, peaceable, open, notorious, exclusive, and adverse possession thereof for more than 10 years under claim of ownership and during all of that time had asserted title to the premises against all persons; that the plaintiff was entitled to a decree quieting title in her; and that the plaintiff was entitled to a permanent injunction against the defendants. In addition the trial court found in favor of the plaintiff and against the defendant Adolph L. Fedde in the sum of $300, being $2.50 a rod for 120 rods of fence; and that the costs be taxed to the defendants Adolph L. Fedde, Mary Ann Fedde, and Harold L. Camp. Judgment was rendered accordingly.

The defendants Adolph L. Fedde and Mary Ann Fedde filed a motion for new trial which was overruled. The defendants Fedde perfected appeal to this court.

The plaintiff alleged in her petition that she was the owner of a tract of land in the southeast quarter of the southwest quarter of Section 4, and in the north half of Section 9, all in Township 12 North, Range 10 East of the 6th P. M., Cass County, Nebraska, more particularly described as follows: "Commencing at the Northeast corner of the Southeast Quarter of the Northwest Quarter, Section Nine, Township Twelve North Range Ten East; thence South 0° 00′, 141.9 feet to the northerly right-of-way line of the C. B. & Q. Rail Road; thence South 45° 14′ East, 117.9 feet; thence N. 11° 51′ East, 785 feet more or less to the southerly bank of the Platte River; thence Northwesterly along said river bank 2100 feet more or less to it's intersection with the C. B. & Q. right-of-way; thence southeasterly along the C. B. & Q. right-of-way to the North line of the Southeast Quarter of the Northwest Quarter in

Section 9, Township Twelve North, Range 10 East; thence East along said North line 131.9′ to the point of beginning; containing 21 acres more or less."

The plaintiff further alleged that she had been in actual, open, notorious, exclusive, adverse, continuous, and peaceable possession of all of said lands for more than 50 years last past; and that for more than that period of time neither the defendants nor any of them had been in possession of any part of said premises or asserted any claim thereto. The petition further alleged that the defendants Fedde were the owners of property immediately adjoining property of the plaintiff on the east; and that the defendant Harold L. Camp was either their tenant in possession or agent for the purpose of moving sand and gravel.

As a second cause of action, the plaintiff alleged that through the use of heavy equipment, the defendants had destroyed trees, grass, and vegetation on the land of the plaintiff as heretofore described, and prayed for damages.

The answer of the defendants Fedde denied all of the allegations contained in the plaintiff's petition not admitted; admitted ownership and described the land east of the land described in the plaintiff's petition; and admitted further that said defendants had leased a portion of said property to defendant Harold L. Camp for mining sand and gravel. The prayer was for an award of immediate possession by them of the land described in the plaintiff's petition and that title thereto be quieted in these answering defendants.

The defendant Harold L. Camp, by answer, denied each and every allegation contained in the plaintiff's petition; alleged that he had a lease from defendant Adolph L. Fedde on land adjoining the property described in the plaintiff's petition; that he was given specific permission by defendant Adolph L. Fedde to go upon the land described in the plaintiff's petition and did so under such defendant's direction and control; and

that the defendants Fedde were the owners of said property described in the plaintiff's petition and were entitled to lease said property to this answering defendant. The prayer was for a dismissal of the plaintiff's petition.

The plaintiff's reply to the answer of the defendants Fedde, and for reply to the answer of Harold L. Camp, denied each and every allegation contained therein except such allegations or parts thereof as admitted the truth of plaintiff's petition.

It was stipulated by the parties that a jury trial of any damage or law issues be waived.

The trial court rendered a default judgment in favor of the plaintiff and against all the defendants who had been properly served and had failed to answer or appear. That such can be properly done if the facts so justify, see Severson v. McKenzie, 122 Neb. 827, 241 N. W. 774. See, also, Worm v. Crowell, 165 Neb. 713, 87 N. W. 2d 384.

For convenience we will refer to the defendants as Feddes, and to Adolph L. Fedde on occasion as Adolph Fedde; to the plaintiff as plaintiff or Emma Olson; and to the other persons by their first or last names, eliminating the middle initial.

The defendants assign as error that the trial court erred in finding generally for the plaintiff and against the defendants on the first cause of action, and against the defendant Adolph Fedde on the second cause of action, and in finding that the plaintiff was the owner of the land in controversy and had been in adverse possession of the same for a period of 10 years or more.

While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue, consider the fact that the trial court observed the wit-

nesses and their manner of testifying. See, Johnson v. Erickson, 110 Neb. 511, 194 N. W. 670; Worm v. Crowell, *supra*.

"The claim of title to land by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for the statutory period of 10 years. * * * The possession is sufficient if the land is used continuously for the purpose to which it may be in its nature adapted." Worm v. Crowell, *supra*. See, also, Burket v. Krimlofski, 167 Neb. 45, 91 N. W. 2d 57.

For actual possession, no particular act is required. What is sufficient to meet the requirements depends upon the character of the land and all of the circumstances of the case. See Hallowell v. Borchers, 150 Neb. 322, 34 N. W. 2d 404.

Counsel for the parties consented that the trial court view the premises. This court has held that, when the court views the topography of a certain locality, its findings are entitled to great weight. See, Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647; James v. McNair, 164 Neb. 1, 81 N. W. 2d 813.

With the foregoing rules in mind, we proceed to a summary of the facts in the instant case.

On January 30, 1891, Otha J. Wortman acquired title by warranty deed to "Government Lots 3, 4 and 5 and the SW¼ of NW¼ and the NE¼ of SW¼ and SW¼ of SE¼ of Sec. 9, Twp 12 N., Rge 10 E. of 6th P. M., in Cass County, Nebraska. Subject to the B & M R R Co's right of way." The Burlington & Missouri River Railroad Company acquired a right-of-way over a part of this land 150 feet wide running along the south bank of the Platte River in 1869. This railroad later became the Chicago, Burlington & Quincy Railroad, referred to in this opinion as the Burlington.

On October 13, 1903, Otha J. Wortman et al. conveyed to Emma Olson (plaintiff) the "South East ¼ of the North West ¼ and the North East ¼ of the

South West ¼ of Section 9 - Town 12 - Range Ten in Cass County Nebraska."

On April 1, 1904, Otha J. Wortman et ux., by warranty deed, conveyed to Axel Nelson the following described land: "Lots Four (4) and Five (5) and the Southwest quarter (SW¼) of the South East Quarter all in Section Nine (9) Township Twelve (12) Range Ten (10) East of the Sixth Principal Meridian, * * * Also the west Sixteen and twenty seven hundredth (16.27) acres of Lot five (5) in Section Ten (10) Town Twelve (12) Range Ten (10) East of the Sixth Principal Meridian."

On April 1, 1904, Otha J. Wortman et ux., by quitclaim deed, deeded to Axel Nelson "All that part of the East half of Section Nine (9) Township Twelve (12), Range Ten (10) East of the Sixth Principal Meridian lying North of the right of way of the Burlington and Missouri River Railroad, including the island in the Platte River in said Section."

On January 5, 1950, Raymond P. Nelson et al., by warranty deed, deeded to George I. Gade et ux. the land described as follows: "Fractional Southeast Quarter (SE¼) of Section Nine (9) Township Twelve (12) Range Ten (10) East of the 6th P. M., Cass County, Nebraska, more particularly described as Lots Four (4) and Five (5) and the Southwest Quarter (SW¼) of the Southeast Quarter (SE¼) of said Section Nine (9) * * *; and the West 16.27 acres of Lot Five (5) Section Ten (10) Township Twelve (12) Range Ten (10) East of the 6th P. M. Cass County, Nebraska."

On January 5, 1950, Raymond P. Nelson et al. deeded to George I. Gade et ux., by quitclaim deed, "That part of the East Half of Section Nine (9) Township Twelve (12) Range Ten (10) East of the 6th P. M., Cass County, Nebraska, lying North of the right of Way of the Burlington Railroad, including island in the Platte River in said section; also the land that lies North of the West 16.27 acres of lot 5, Section 10, Township 12,

Range 10, Cass County, Nebraska, which land is North of the right of way of Burlington Railroad."

On December 30, 1955, George I. Gade et ux. deeded to Adolph L. Fedde et ux., "The fractional Southeast Quarter (SE¼) of Section Nine (9), Township Twelve (12) North, Range Ten (10) East of the Sixth Principal Meridian more particularly described as Lots Four (4) and Five (5) and the Southwest Quarter (SW¼) of the Southeast Quarter (SE¼) of said Section Nine (9), * * *; and the West 16.27 acres of Lot Five (5) of Section Ten (10) Township Twelve (12) North, Range Ten (10) East of the Sixth Principal Meridian, * * *."

On December 30, 1955, George I. Gade et ux., by quit-claim deed, conveyed to Adolph L. Fedde et ux., "that part of the East Half of Section Nine (9) Township Twelve (12) Range Ten (10), East of the Sixth P. M., Cass County, Nebraska, lying North of the right of way of the Burlington Railroad, including island in the Platte River in said section; also the land that lies North of the West 16.27 acres of Lot 5, Section 10, Township 12, Range 10 East of the Sixth P. M. Cass County, Nebraska, plus all land accreted to the above described property, which land is North of the railroad right of way of Burlington Railroad."

The above description of lands constitutes the history of conveyances up to the time this case was heard. The land acquired by Emma Olson, plaintiff, is west of the land acquired by Axel Nelson, now the Fedde land. What is designated as Nelson Island is the land over which this controversy arises, and Nelson Island, as it is commonly referred to in the record, is northwest of the Burlington right-of-way and of the Olson and Fedde land.

The defendants Fedde contend that the conveyance to them constituted them as the owners of the record title to the land in dispute in this case, and that the plaintiff has no claim to such land by adverse possession.

A survey was made of Sections 4 and 9, Township 12

North, Range 10 East of the 6th P. M., in Cass County, Nebraska, about June 13, 1958. On the surveyor's first visit over the area, a standing fencepost was pointed out to him. This post was standing about 4 feet out of the ground. He and the group with him walked along the area toward the river where they found a cottonwood tree that had been used as a fencepost. This tree was about 36 inches in diameter. There was barbed wire buried in the bark of the tree, and the bark had grown over the wire. The wire was old and rusty. The wire in this cottonwood tree extended to the north and south, and was not much more than a foot in length. Also, to the south was found another fencepost lying on the ground with barbed wire in it, and other posts on the ground which were obviously fenceposts. Approximately 30 to 40 feet north of the cottonwood tree the surveyor found an old east-west fence. The posts were broken and rotted, and the wires were lying on the ground. He found no definite line or designation on the terrain or in the area to show a continuation of the north-south section line. He further testified that he was unable to sight the half-section line north and south from the center of the section south of the Burlington railroad with any degree of accuracy because south of the right-of-way was a steep bluff, heavily wooded. He further testified that the plot he surveyed consisted of approximately 21 acres.

The plaintiff lived on her 80 acres of land with her husband George Olson until his death in 1928. Her son-in-law, Martin Stenberg, moved to the farm in 1929, took over the management of the farm, and the plaintiff lives with him. The plaintiff was 94 years of age at the time of trial. Axel Nelson, the plaintiff's brother, and his wife Emma lived on the Nelson farm until Axel Nelson's death on April 20, 1939. On June 21, 1948, Emma Nelson died. There were three sons, Raymond, Elmer, and Allen, who are Axel Nelson's heirs at law.

Martin Stenberg testified that he moved to the Olson farm in February 1929; and that before he moved to the farm he visited the plaintiff and his father-in-law and was on the land in dispute prior to the time he was married in 1921. He further testified that there was a sandpit on the land in dispute before he moved on the farm; that he first observed this sandpit in 1923 or 1924; that there were railroad tracks in the vicinity of the sandpit about 200 or 300 feet south of the big cottonwood tree; that there was a spur used to haul gravel and sand from the sandpit to the Burlington main line; that this sandpit was on the Nelson property and belonged to the Moffett Sand and Gravel Company; that there was a lease between the plaintiff and the sand company, and the company paid the plaintiff rent for the use of a part of the property in dispute; that the only names on the lease were those of the Moffett Sand and Gravel Company, the plaintiff, and possibly George Olson; that said company obtained its fuel supply from a supply tank along the railroad; and that in 1923, there was a cement platform built along the railroad tracks which is still there. This witness further testified that before he moved onto the farm there was a channel that practically followed the railroad tracks. He first observed this channel in 1919. The sand company put in a dike above the spur and across the channel, and the dike is still in place. After the spur was taken out, the grade where the spur had been was used as a road. The character of the ground to the south, west, and northwest of the channel consisted of underbrush, grass, and weeds, and the only time there was any water over this land was at flood stage. At one time there were a number of channels in that area, which filled up. This witness and his brother cut cottonwood trees and felled them into the river to help fill up the channel. After he moved onto the farm in 1929, he observed a three-strand barbed-wire fence running north and south across this island. This fence constituted the boundary

line between the Olson and Nelson farms. In 1958, this witness erected a fence in the same place as the old fence, which ran straight north to the river. The old fence consisted mostly of split railroad ties, some cedar posts, and wire. There was a gate across the old spur south of the big cottonwood tree. He further testified that it was impossible to sight the half-section line when standing on the railroad tracks because of the heavy trees in that area; that he cut wood in the area, and sold it to purchase groceries; that the land in dispute could not be cultivated from 1921 to 1936, because it was low land and heavily timbered; and that from 1936 until the time he built a new crossfence in 1958, running in the same direction as the crossfence built in 1926, the land was used for the purpose of pasturing, hunting, fishing, and obtaining wood, the purpose for which it had always been used and for which it was adapted. He further testified that a man named Fulton operated a sawmill on this land off and on for a year, and received permission to do so from the plaintiff.

This witness further testified that he had known Axel Nelson since 1919, and during that time Axel Nelson never made any claim to the land in dispute, nor did the Nelson heirs, nor did George Gade; and that Adolph Fedde made no claim to this property prior to the time some bulldozing was done on the land in dispute in 1958. This witness further testified that he knew both Masser and A. J. Cianciola who had a cabin in the area north and just east of the crossfence; that in September or October 1957, Adolph Fedde asked this witness for permission for one Jay Enright to drive through the land to hunt on Moss Island, to the north of the land in dispute, and this permission was granted; and that in 1958, defendants Camp and Adolph Fedde talked to this witness about extending the spur on the land in dispute and were told that there had been a spur in that locality, and suggested that Camp talk to the plaintiff and to him about this matter. He further testified

that to his knowledge no one asked the plaintiff to cease her possession of this land, nor made any claim to it; that no effort was ever made by the plaintiff to hide her claim to the land in dispute and she at all times acted as the owner of this land; that people could see what this land was used for; and that it was continuously used for the purpose for which it was adapted. He further testified that there was a gate at one time from Olson's deeded land across the railroad right-of-way; that this was before 1929; that this witness helped George Olson take horses down the bluff, across the railroad tracks, and onto the land in dispute; and that at that time Axel Nelson had no stock on such land. This witness further testified that when he first knew the land in dispute the island, which has been referred to as Nelson Island, was on the property of Wortman, or Gade, or Nelson, and through the years worked west until it became one large island; that originally the big cottonwood tree marked the end of Nelson Island; that the crossfence was put in to keep Axel Nelson's cattle from going onto the Olson property and Olson's horses from going onto the Nelson property; that in 1929, there were no fences along the river north of the crossfence; that there was a fence built by George Olson along the railroad right-of-way; and that Axel Nelson had fences along the boundary of his land. In 1936, Axel Nelson asked this witness if he could use the wire on the crossfence to fence the north side of his land. This witness testified relative to a sawmill which he discussed with a man named Castin. This witness received rent for permitting the sawmill to be on the premises in dispute in the form of 124 2 x 6 boards. He informed the operators of the sawmill where to set their operation, and the place that they should stop the work. He further testified that he took horses and cattle and hauled wood from the land in dispute through the Nelson place; that while George Olson was alive, none of Nelson's cattle ran west of the crossfence where Olson

had his horses; and that west of Nelson Island, referred to also as the big island, where the crossfence was located, there were channels and small islands where George Olson used to pasture his horses and cattle.

Paul Olson testified that the plaintiff is his mother; that he was born in 1905, and lived on the Olson land with his parents until 1928, and has been on this land many times since 1928; that he knows Stenberg and of his occupancy of the Olson farm since 1929; that he hunted and fished on the land in dispute with his brother and Stenberg; that during 1924, he worked for the Moffett Sand and Gravel Company, and continued such work through the summer of 1925; that the spur was removed; and that he saw his father, George Olson, build the crossfence in May or early June 1926, in the same location as the new crossfence built by Stenberg in 1958. He recalled the gate over the spur, and also that he helped his father cut wood in the area in dispute, and trapped on this land. He further testified that the wire was in the crossfence 10 or 12 years, and most of the posts were there until 1942; that his mother claimed to be the owner of the land west of the crossfence and north of the tracks of the Burlington; that Axel Nelson owned the land east of the crossfence; that from 1928 to 1936, the land in dispute was used for pasturing, hunting, and fishing, and from 1936 to 1958, for grazing, hunting, and fishing; that Axel Nelson, until the time of his death in 1939, made no claim to the land west of his property-line fence; that from this witness' earliest memory he knew of no complaint about the plaintiff claiming such land or of the use of the land in dispute; that no one claimed ownership of this land other than the plaintiff; and that at the time the crossfence was built, the channel had been filled in.

Otto Olson testified that prior to 1925, he lived with his parents on the Olson farm. He further testified that he first saw the crossfence in 1926, running south from the cottonwood tree to the railroad, and observed the

gate across the spur; that he knew Axel Nelson, his heirs, Gade, and Adolph Fedde, and none of these persons ever made any claim to the land in dispute from the time he knew it; that although he had left home in 1925, he returned at various times; that he took a picture of the tree on the north end of the fence constructed by his father, showing the new fence and the wire from the old fence; that the old wire on the crossfence built in 1926, runs north and south the same as the new wire on the fence built in 1958; that he went through a gate in the Burlington fence to hunt and fish on the land in dispute; that he remembered two islands, one to the east and one to the west, when he was first there, and these islands joined together; and that there was a road to the west across the tracks near the high bank which his father used to take the cattle to the land in question.

Jess Fidler testified that he worked for the Western Sand and Gravel Company, and recalled that the Moffett Sand and Gravel Company sold out to Lyman & Richey in the spring of 1926. He came into the area in dispute to remove the equipment, and the spur was there at that time. This spur was crossed by a fence. He further testified that he recently observed a new fence in the area which was in approximately the same location as the fence built in 1926. He also recalled seeing a big cottonwood tree at the end of Nelson Island, and the fence ran from that location over close to the platform built for a gasoline tank near the tracks.

Allen Nelson testified that he was born on the Nelson farm and is the son of Axel and Emma Nelson. Emma Olson, the plaintiff, is his aunt. He testified that he knew Adolph Fedde and was familiar with the land in dispute; that he lived on the Nelson farm until 1938, was gone for a year, returned in 1939, then lived on such land until 1950. He recalled that there was a fence along the Burlington track and a crossfence along the line between the Olson and Nelson farms running north and south; that old railroad ties were used for

posts for this fence; and that this fence crossed the spur. He first saw this crossfence in 1926, which was the year it was constructed, and that fence stayed there for roughly 10 years. Later the wire was removed from that fence and he helped to do this. This was done for the purpose of building a fence along the riverbank to keep the cattle from crossing the river. This latter fence was built from the crossfence, the length of the island. After his father's death in 1939, this witness became part owner of the Nelson land. Neither he nor any member of his family ever claimed any land west of the crossfence. It was claimed by the Olsons. He further testified that before 1926, his father, Axel Nelson, had fences on his land, but had no fence west of the crossfence; that the wire was taken off the crossfence and used along the north side of the island; that before 1926, his father had cattle below the east-west fence along the river, and Olson's cattle were pastured above this location; that members of his family cut wood on the east end of the land in dispute; that if wood was cut on the west half of such land by members of his family it was done to help Stenberg; that George Olson had horses and calves west of the crossfence; and that these animals were taken down on a part of the north road which was on the Olson land.

Elmer Nelson testified that he was a son of Axel and Emma Nelson and lived on the Nelson farm until 1933; that he was familiar with the land in dispute; and that he first saw the crossfence in 1925 or 1926. He recalled that there was a wire gate over the spur. He testified that Olsons pastured the land west of the crossfence; that no member of the Nelson family ever claimed any interest in the land in dispute; that the plaintiff always claimed to own such land; that the channel started to fill in 35 years ago; and that the land in dispute was not considered an island but was considered as part of the mainland.

George Gade testified that he took possession of the

Nelson property on or about March 1, 1950; that he sold this land to the defendants Fedde in 1956; and that at that time he knew that the plaintiff claimed the land west of him and north of the railroad tracks. The agent who negotiated the deal between this witness and the Feddes took him down to what is called the island. There he saw evidence of a fence, roughly in the extension of the center section line, consisting of what he thought were some posts and some wire. He further testified that he never purported to own or claim the land west of the crossfence. When he sold the land to the Feddes, Adolph Fedde wanted him to give a quitclaim deed to all of the land on Nelson Island, and he told Adolph Fedde that he would give him a deed to the land north of his place, and no more. When he bought the land from the Nelson heirs there was in fact no island, and he bought only the land lying north of his place. His cattle ran over the entire area, with Stenberg's cattle. After he was on this land 2 years, he and Stenberg built a fence along the riverbank, north of the railroad tracks, clear to the west end of the land in dispute. This was a three-wire fence, with one electric wire. He told hunters where the property line was when they came to hunt, and told Castin to take wood only from that part of the land which he owned.

The agent who negotiated the sale between Gade and the Feddes testified that he pointed out to Fedde the west property line north of the railroad tracks and told Fedde that he could obtain a quitclaim deed to all of the land east of the crossfence.

Elmer Welton testified that he knew the area in dispute; that he did a lot of trapping, hunting, and fishing in such area in 1928, and for 6 or 7 years thereafter; and that this was the way in which he made his living. He further testified that he observed the crossfence, and had to open the gate to get over the spur to get to the place where he hunted and fished; that he saw the fence erected by Stenberg in 1958, which was in the same

location as the old crossfence; that the old crossfence remained in place for 10 years; and that the wire was taken off the posts, and the posts remained and were in approximately the same place as the fence constructed by Stenberg. When going into this disputed area, he went through the Axel Nelson place. He asked Axel Nelson for permission to go upon the land in dispute, was told by him to ask the plaintiff, and he obtained permission from the plaintiff to do so.

Clarence Vandeman, who was a partner of Elmer Welton, testified that he fished with Welton in the area in dispute; that he had a recollection of a fence constructed by George Olson that ran north and south; that he also recalled the spur and the gate; and that wire was attached to a good-sized cottonwood tree. He further testified that he had been in that area in recent months and had observed the new fence built by Stenberg which was in approximately the same location as the old crossfence; that the cottonwood tree was next to the riverbank; that after the wire was taken from the crossfence he could see the old fenceposts were in the same place; that he worked for the Burlington from 1946 to 1948, and would go up and down the tracks in that area; that the last time he recalled seeing the posts of the first crossfence was sometime between 1946 and 1948; that he knew the plaintiff, and asked her permission to hunt and fish in the area in dispute; and that he and Welton went through the gate on the Nelson land then up through the gate across the spur to the area in dispute.

Wally Wagner, a railroad section worker for the Burlington since 1917, testified that he knew George Olson and knew that the old crossfence was built in 1926, as he saw George Olson building it; that he helped unload the ties that George Olson used for posts; that George Olson also built the first fence along the railroad right-of-way; that no pasturing occurred in that area until it was fenced in; and that Stenberg constructed a cross-

fence in the same location as the old crossfence. This witness further testified that he helped to build the spur, and had opened and closed the gate in the fence that was built by George Olson.

Earl Dreamer testified that he was familiar with the land in dispute; that he knew Axel Nelson and his wife, but did not know the plaintiff or her husband; that he started to go on the land in dispute in 1917, and obtained permission to do so from Axel Nelson; that in order to get to this land he went through Nelson's yard to the east gate, then to a road across the railroad tracks; that he was on this land on an average of once every two weeks from 1917, and hunted there in 1919; that in 1927, he and other persons bought a cabin which was located south of the railroad tracks at the corner of the Axel Nelson place, across from the sandpit; that he hunted and fished over the entire island; that he never saw a crossfence running north and south across the island; that he had been over this land a great many times between 1927 and 1929; and that Axel Nelson built a fence to keep the cattle out of the river in 1934. This witness further testified that he remembered two fences built by Axel Nelson at the west end of the island, the first being built in 1927, and the second one in 1930.

Oscar Neumann testified that he had known the land involved in this litigation since 1920; that when he first went on this land in 1920, he did not ask permission of anyone to do so; and that he and his father fished from this island many times. He further testified that there was a meadow at the lower end of the island and a small channel that ran between it and the Nelson main island, which channel was 100 to 150 feet wide. The first time he asked permission to go on the island was in 1924, and he obtained this permission from the Nelsons. Since 1924, he had never seen a north-south crossfence across this island. The first time he ever saw a fence, it was along the right-of-way of the railroad in the 1930's. He testified that he had never seen a footpath or road from

the Olson property down the bluff and across the railroad tracks.

William Leddy testified that he knew the Nelson family and the Olson family; that he had been acquainted with the land in dispute since the early 1900's; and that he used to go on this land to hunt and fish. He started to do so in 1903, and was on this land a number of times all through the years up until the time Gade moved onto the Nelson land. He testified that the road across the Nelson place was the only way to get to the land in dispute; that he never saw a crossfence running north and south at any of the times he was on this land; and that he never saw a gate in the right-of-way fence along the Burlington tracks. He further testified that he never asked any person for permission to go onto this land, and saw neighbors, strangers, and numerous people on this land; that there were gates across the Nelson road all of the years that he went on this land, one at the Nelson house and one at the railroad right-of-way; and that he was on this land three or four times a year from 1903 until 1950.

Edgar Sweem testified that he had been a section foreman and knew the location of the property in dispute, but did not know much about the property. He further testified that he passed this property from May 10, 1937, until February 28, 1944, for the purpose of taking care of tracks, fences, and crossings. In 1937, there was a fence along the Burlington right-of-way. He never saw a row of posts that would designate where a crossfence running north and south had been located in 1937, on the numerous times he passed over that area. He further testified that there were no gates that he saw, except at the Nelson crossing; and that he knew Stenberg fed cattle on this land after 1937.

Francis Fulton testified that he operated a sawmill in 1953, and made arrangements with Gade to do so; that Gade sold timber to Fred J. Castin, and this witness cut the logs for the purchaser; that Gade never gave

him instructions confining his work to any one part of the island, but told this witness to pick his site, and help set the sawmill up; and that he never paid Stenberg any money or lumber of any kind. Later in 1956, he did cut lumber on the land in dispute for Adolph Fedde, and dealt with him, but never with Stenberg or any other person. No one ever told this witness that Olson claimed this land.

Ralph Dreamer testified that when he lived at home he and his father went onto the land in dispute. He remembered going on this land first in 1929, and had been on this land from 1929 up until the past year, hunting and fishing. He further testified that he did not remember a crossfence running north and south since he had been on this land.

Laura A. Dreamer corroborated the testimony of her husband Earl Dreamer to the effect that at the times she was on the land in dispute with him, as he testified, she never observed or saw any crossfence running north and south across the island.

W. O. Schewe testified that he knew Axel Nelson; that he went fishing on the land in dispute before Axel Nelson bought the farm; that the island was a kind of a jungle when he first went on it; that he never saw a crossfence running north and south across the island and which was constructed in 1926; that he did see a fence at the west end of this island that was built by Axel Nelson; and that to the best of his recollection there was no road down the hill on the Olson land that lead to the land in dispute.

Harold Buell testified that he knew the Nelsons and the Olsons; and that he went on the land in dispute ever since he could remember to hunt and fish and to help when that was demanded. Between 1930 and 1934, there was a fence along the railroad tracks, and a fence on the north side of the island. He could not remember any crossfence running north and south across the island. He further testified that Stenberg and Axel

Nelson had cattle on this land in 1934 or 1935, and these cattle ranged the entire island.

Adolph Fedde testified that when he took the warranty deed and the quitclaim deed to the Nelson property, he claimed all of the land in dispute; that after he took possession he sawed timber on this land, sowed grass, and had a bulldozer move onto it on two occasions to do some riprapping; and that he and the real estate agent who negotiated the deal between Gade and this witness were over nearly all of the exterior of the land in dispute. He denied that the agent pointed out any property lines which would separate the property which he purchased from the land in dispute. He further testified that the agent told this witness he was going to sell him just what the quitclaim deed called for. This witness further testified that he entered into a lease agreement with Camp for the purpose of pumping sand on the land in dispute. Some of the fence on the north side of the island washed into the river, and before work with the bulldozer could be started some of the fence was rolled up and some of the posts removed. This fence was in bad shape. This witness further testified that Fulton went onto this land with a bulldozer and toppled some of the trees into the river. This was a year or two prior to the time that Camp entered the land to do some bulldozing on it. This bulldozing ran from east to west across the entire island, and was done in 1956 or 1957. This witness further testified that he had seen the cottonwood tree that has been described with the wire in it; that the wire in that tree protruded from the tree at right-angles to the fence which was put in there, that is, the wire was sticking out of the west side of the tree; and that there were fenceposts standing up along the riverbank, east and west of this tree. With reference to whether or not there was any evidence of fenceposts to show that there had been a north-south fence, this witness testified that there were pieces of wood and posts all over the island,

and he could ascertain no evidence of any particular fenceposts being found in the immediate vicinity that would indicate that there had been a north-south fence built, as claimed by the plaintiff. This witness further testified that he leased land on the island for cabins, and different spots for duck hunting.

On cross-examination this witness testified that the written lease he had with Camp read as follows: "through all of that land north of the tracks and the east half of the section (section 9)." He further testified that he had a verbal agreement with Camp that if he wanted to pump on the other part, if this witness was satisfied with his pumping arrangements, he would let Camp pump in Section 10, or up on the other land.

A. J. Cianciola testified that he owned a cabin in the immediate area of the property in dispute. In 1956, he leased the ground from Adolph Fedde. At that time he told Adolph Fedde he wanted the last place he had for cabin purposes as he desired privacy. Later Adolph Fedde sold him a parcel of land that was on the east side of the crossfence, and pointed out a tree as one of the things that constituted the boundary line between his property and other owners. At the same time Adolph Fedde told this witness that he had had the land surveyed and that that was the property line, and told this witness not to exceed that property line because he was not sure who it belonged to.

The evidence relating to damages may be summarized as follows: Gade and Stenberg built a 3-wire fence with two barbed wires and one smooth wire along the riverbank. The entire distance where this fence was constructed was bulldozed out by the defendants. The distance covered by the bulldozing conducted by the defendants which destroyed this fence was approximately 2,100 feet. After the fence was constructed, Adolph Fedde asked Stenberg by what right he had constructed the fence. Stenberg asked Adolph Fedde who gave him permission to move onto the land with a bulldozer and

he replied that he had given Camp permission to go. onto the land with the bulldozer. When Camp entered. upon the land with his bulldozer, he bulldozed right along the river, and knocked down trees west of the Cianciola cabin. The reasonable price for the fence was testified to by Stenberg to be approximately $2.50 a rod. After viewing the premises, the court awarded damages to the plaintiff in the amount of $300.

In James v. McNair, *supra*, this court said: "The law does not require that possession shall be evidenced by a complete enclosure, nor by persons remaining continuously upon the land and constantly from day to day performing acts of ownership thereon. It is sufficient if the land is used continuously for the purposes to which it may be in its nature adapted."

It is the established law of this state that, when a fence is constructed as a boundary line between two properties, and parties claim ownership of land up to the fence for the full statutory period and are not interrupted in their possession or control during that time, they will, by adverse possession, gain title to such land as may have been improperly enclosed with their own. See, Pfeiffer v. Scottsbluff Mortgage Loan Co., 105 Neb. 621, 181 N. W. 533; Krumm v. Pillard, 104 Neb. 335, 177 N. W. 171; Hallowell v. Borchers, *supra;* Konop v. Knobel, 167 Neb. 318, 92 N. W. 2d 714; McGowan v. Neimann, 144 Neb. 652, 14 N. W. 2d 326.

In the instant case the evidence shows that the plaintiff owned the only deeded land north of the railroad which laid north of her place. It consisted of a small triangular tract on the half section line, as shown by the surveys in evidence. This land never washed out, as the evidence shows that the channel of the Platte River came down along the railroad right-of-way, swerved away at the triangular tract, and then cut back near Nelson's crossing. This is shown by the fact that either on or in the immediate vicinity of this triangle the Moffett Sand and Gravel Company placed a concrete

platform for a supply tank on their first spur that was built, and which platform is now in existence. The original Wortman Island, later known as Nelson Island, ended at the crossfence. After the dike was put in by the people operating the sandpit, which dike was to the west, the area filled in rapidly. Therefore, the evidence discloses that the area in question was accreted to the railroad right-of-way and to the triangle owned by the plaintiff, as effectively as it was accreted to Nelson Island. George Olson built a fence in a north-south direction, starting as close to the section line as the terrain would permit, in 1926. Prior to the building of such fence and subsequent thereto, Axel Nelson never claimed any land beyond the boundary line of this fence. At all times the plaintiff claimed to own this land. Gade, who purchased the Nelson land from the Nelson heirs as the evidence discloses, never claimed to own the land in dispute.

From a review of the entire record, the evidence discloses that for a period of over 50 years no claim was ever made against the plaintiff's use of the property in dispute, and for a period of 30 years there was a fence, or evidence of a fence, indicating exactly where the claimed boundary line existed. For 10 years this boundary line running north and south was well fenced.

From an examination of the entire evidence, we are convinced that the plaintiff has been in the open, notorious, exclusive, continuous, and adverse possession of the strip of land in question for more than the statutory period of 10 years, and that she is entitled to have a decree granted showing that she is the owner of such land.

For the reasons given herein, the judgment rendered by the trial court is affirmed.

AFFIRMED.

ELLWOOD B. CHAPPELL and PAUL E. BOSLAUGH, JJ., not participating.