IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STAMM V. FISHER


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


VIKKI S. STAMM, APPELLANT AND CROSS-APPELLEE,

V.

RYAN FISHER ET AL., APPELLEES AND CROSS-APPELLANTS.


Filed June 2, 2015.    No. A-14-592.


Appeal from the District Court for Buffalo County: TERESA K. LUTHER, Judge. Affirmed as modified.

Michele J. Romero and Vicki S. Stamm, of Stamm, Romero & Associates, P.C., L.L.O., for appellant.

Larry W. Beucke, of Parker, Grossart, Bahensky, Beucke & Bowman, L.L.P., for appellees.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

## INTRODUCTION

Vikki Stamm appeals the order of the district court for Buffalo County granting appellees adverse possession of a portion of the contested property between the parties' two tracts of land. Appellees (hereinafter "the Fishers") cross-appeal the modified legal description of the property as they assert it does not contain the entirety of the land that was adversely possessed. For the reasons that follow, we affirm as modified.

## BACKGROUND

This action was originally brought as a quiet title action by Stamm in early 2013. Stamm is the record owner of the land identified as the "Southwest Quarter of the Southeast Quarter

- 1 -

(SW1/4 SE1/4) of Section Seven (7), Township Ten (10) North, Range Seventeen (17) West of the 6th Principal Meridian, Buffalo County, Nebraska." The previous owners of the property were Rubye Faye and Grover Stubbs, Stamm's aunt and uncle. The Stubbs acquired the property in 1956 and farmed it until the 1980s. During that period of time they also ran cattle on the land.

Ryan and Bradley Fisher are brothers, and are the record owners of the remainder interest in the land identified as "The East Half of the Southeast Quarter (E1/2 SE1/4) of Section (7), Township (10) North, Range Seventeen (17) West of the 6th Principal Meridian, Buffalo County, Nebraska." Ryan and Bradley acquired their interest in the land in 2011 subject to a life estate held by their parents, Harvey and Barbara Fisher. Harvey and Barbara acquired the property in 1994 from Harvey's parents, Virgil and Anna Fisher, who acquired the property in 1963. Prior to 1963, the land was owned by Virgil's aunt who acquired the property in 1934. The property had been in the Fisher family since the late 1880s.

The Stamm real estate is adjacent to the Fisher real estate on the west, and both properties are near Amherst, Nebraska. The contested property is a trapezoid-shaped section measured to be approximately .852 acres contained within the surveyed boundaries of the Stamm property.

Harvey testified that he farmed the Fisher property with his father beginning in 1963, but he first became involved in the property in 1950, helping his uncle Frank bale hay. He recalled a fence between the Stamm and Fisher property which extended from 175th Road on the south into the woods in the North. Harvey testified that he had always considered the fence to be the boundary between the Stamm and Fisher properties. He described the fence as a good, solid fence with four barbed-wire strands and wood posts spaced a rod apart. He stated that there was also a solid fence extending from the southwest edge of the Fisher property to the east. In the 1950s, the only entry to the Fisher property was through a gate east of the contested real estate. He testified that crops were planted along the north-south fence line. Harvey testified that he never saw an electric fence placed to the east of the north-south fence.

Harvey testified that part of the north-south fence still exists on the north end between the properties. He identified a metal remnant that ran along the fence line that had been there as long as he could remember. He stated that he recalled the remnant from repairing and walking the fence line over the years. Harvey was diagnosed with cancer in 1987 and a "community harvest bee" was initiated to assist him with the harvest of his fields that year. A photograph taken at that harvest bee shows a north-south fence with four barbed-wire strands and wooden posts.

Edward Rumbeck, a resident of Amherst testified that he was familiar with the fence and it existed as early as 1948. He also stated the photograph shows the north-south fence as it existed on the day of the harvest bee. He testified he did not recall seeing an electric fence east of the north-south fence, and he believed the north-south fence was removed in 2013, but he stated he had not been on the property recently.

Jerry Fisher, Harvey's brother testified that he farmed the Fisher property with his father from 1963 to approximately 1975. He recalled the north-south fence was present during that time, and was maintained in the 1970s by Grover Stubbs, with some assistance from the Fisher family. He did not recall an electric fence being placed to the east of the north-south fence at any time.

Charles Stryker married Grover Stubbs' daughter and farmed the Stamm real estate from 1974 through 1979. He recalled a fence on the property from the road on the south end of the

property running to the north. He testified that he farmed the Stamm property up to the fence line. He also ran cattle on the land, and used the north-south fence to contain the cattle. He did not recall using an electric fence to contain the cattle, and testified that the land did not have electricity at that time.

There is a well on the contested land that was drilled at the request of Virgil Fisher in 1975. The well was drilled by Jerry Jameson and his father. Initially Jameson picked the location to be about 7 to 8 feet from the distinct fence line that existed at that time, but after consulting with Virgil, the final location of the well was set approximately 25 feet to the east of the fence line. Jameson testified that there was no reason the well could not have been drilled even farther to the east.

Ryan Fisher testified that he was 43 years old and was a life-long resident of Amherst. He recalled his first memory of the fence was from the early to mid-1980s. Ryan testified that the fence was a four-wire barbed wire fence with wooden posts, and an occasional steel post used to repair areas where a wooden post had broken off. He testified that the fence began near 175th Road and ran to the north into a wooded area near the northern border of the property.

He testified that he treated the fence as if it was the boundary between the Fisher property and the Stamm's neighboring parcel. Ryan testified that he farmed the property close to the fence line but left enough room to drive along the land to access the well. He testified that the owners of the Stamm property farmed the land to the west of the fence close enough to allow a turn row for their farming equipment.

The Fishers ran cattle on the contested property until approximately 2003. The cattle were contained by the fence on the west side, and an electric fence running east to west along 175th Road to the south. Ryan testified that in the time he participated in farming the land he did not ever observe an electric fence placed to the east of the north-south fence. He stated that he was present on the contested property daily during irrigation time, and every two to three days during cattle season. He stated he was there often enough to see an electric fence if it had been placed there.

Ryan stated that the north-south fence was present on the property continuously from his earliest recollection in the early 1980s through 2005 or 2006, and he maintained it at times by replacing staples which held the wires in place, fixing wire and replacing wooden posts with steel ones as needed. The fence slowly deteriorated and the barbed wires became rusty. He testified that he removed the fence in approximately 2006 or 2007 because it was in a state of disrepair, and the family was no longer running cattle on that parcel.

Douglas Stamm, Vikki's brother testified that he hunted on the property in 1963. He testified that he recalled a fence, but that it was not built until 1967. He testified that the fence deteriorated after approximately one year, and would not hold cattle after that. He stated that the only reasons to put up a fence would be to hold cattle or to mark a boundary. He testified that an electric fence was placed to the east of the north-south fence annually after 1970. He also testified that the Fishers always farmed to the east of the north-south fence, and the Stubbs and Stamms farmed to the west of the fence.

Vikki testified that the fence was placed where it was to avoid the fence posts being subject to standing water or drifting snow because there was a change of elevation of approximately 2 to 3 feet in that area. Vikki testified that she helped maintain the fence until the late 1990s, when the

Stubbs stopped raising cattle. She testified that she and the Stubbs used an electric fence approximately 10 to 15 feet to the east of the north-south fence to hold cattle on the property. She stopped working on the north-south fence in approximately 1997 or 1998 when Grover became sick.

Vikki stated that starting in 1978, she helped the Stubbs rebuild an electric fence almost every year before they released the cattle on the property. She said the fence was present from November until December or January. She said she maintained the disputed property by cutting weeds and musk thistle, and she used the field drive to access her property. She also testified that no one had ever asked her to leave the contested property, and she hunted on the north end of the property frequently. She provided documentation of real estate taxes paid on the Stamm property since 1965.

John Bauer, an associate professor of geography at the University of Nebraska-Kearney testified that he holds a master's degree and a doctorate in geography, and that he also worked as a land surveyor for approximately ten years. He testified that he reviewed aerial and topographic maps of the Stamm and Fisher properties, and concluded that the configuration of the properties appeared unchanged between 1951 and 2011. He identified indicia of a fence, including vegetation growing down the center of the gap between the parties' crops.

Daniel Engels testified regarding aerial photographs of the property dating back to 1993. He testified that the general configuration of the area and crops remained generally the same in each of the photographs from 1993, 1999, 2003, 2006, 2009 and 2012. He stated that he could not see a fence in the photographs but acknowledged that a fence could have existed. He also identified a line of vegetation between the Fishers' crops and the crops on the Stamm property and testified that vegetation often grows along a fence line.

Mitchell Humphrey, a registered land surveyor, created Exhibit 101, which contains the legal description of the contested real estate. He was asked to survey a line along the remnants of the fence line. To establish a line, he needed to use at least two points. Humphrey testified that he located remnants of the fence on the property. One fence remnant was a length of barbed wire which was attached to a cottonwood tree in the northern portion of the contested property. Humphrey testified that he used a remnant of fence located in the northern portion of the contested property as one point, and another point was a remnant of iron embedded in the ground in the southern portion of the property. The remnant of iron was found to be within one to two tenths of a foot of the one quarter section line.

The trial court entered an order granting the Fishers' claim for adverse possession and title in the land and the court's revised legal description was quieted to them. The trial court granted Stamm's claim for quiet title only as to the property not included in the revised legal description. The court also ordered a boundary fence to be erected in conformance with the order and each party was ordered to pay one-half of the costs of the fence. The Fishers were ordered to pay Stamm $102.67 to reimburse her for the real estate taxes on the disputed property for the years 2009-2013. Stamm filed a motion for new trial, which was overruled on June 20, 2014. Stamm timely appealed.

ASSIGNMENTS OF ERROR

Stamm asserts the trial court erred in preventing her from introducing statements communicated to her by her aunt and uncle prior to their deaths under the residual exceptions to the hearsay rules. Stamm asserts the trial court erred in finding the Fishers gained title to the contested property by adverse possession, in finding against her theory of ejectment, and in overruling her motion for an injunction. She also asserts the trial court erred in restricting the award of damages to the four years prior to the filing of the case, and in providing a legal description of the contested property that is inadequate and inaccurate.

In their cross-appeal, the Fishers assert the trial court erred in modifying the proposed legal description of the contested property to exclude the southernmost thirty feet of the contested strip of land.

STANDARD OF REVIEW

A quiet title action sounds in equity. *Schellhorn v. Schmieding,* 288 Neb. 647, 851 N.W.2d 67 (2014). On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations. *Id.* However, where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.,* 276 Neb. 481, 755 N.W.2d 583 (2008).

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Grosshans,* 270 Neb. 660, 707 N.W.2d 405 (2005).

ANALYSIS

*Residual Exception to Hearsay Rule.*

Under the Nebraska Rules of Evidence and the Nebraska statutes, hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Reissue 2008). Hearsay is not admissible except as provided by the rules of evidence.

At trial, Stamm sought to introduce statements Rubye Faye and Grover Stubbs made to her and to her brother, Douglas, regarding the Fishers' use of the property and the construction and upkeep of the north-south fence. The Stubbs were both deceased at the time of trial. Stamm sought to use the Stubbs' statements as proof that the Fishers farmed and used the disputed property with the Stubbs' permission, thereby proving the land was not adversely possessed by the Fishers. Stamm asserts the Stubbs' statements are admissible under the residual hearsay exception contained in Neb. Rev. Stat. § 27-803(23) (Reissue 2008) and § 27-804(2)(e) (Reissue 2008), and the trial court erred in failing to allow her to introduce those statements at trial.

Both § 27-803(23) and § 27-804(2)(e) state:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the

statement is offered as evidence of a material fact, (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

The Nebraska Supreme Court has stated that in determining whether a statement is admissible under the residual exception to the hearsay rule, a court considers five factors; (1) the statement's trustworthiness, (2) materiality of the statement, (3) probative importance of the statement, (4) interests of justice, and (5) whether notice was given to an opponent. *State v. Epp,* 278 Neb. 683, 773 N.W.2d 356 (2009).

In determining admissibility under the residual hearsay exception, a court must examine the circumstances surrounding the declaration in issue and may consider a variety of factors affecting trustworthiness of a statement. *Id.* A court may compare the declaration to the closest hearsay exception as well as consider a variety of other factors affecting trustworthiness, such as the nature of a statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement.

The notice Stamm provided to the Fishers stated her intention to offer statements made by Rubye and Grover "concerning the property at issue in this case, including but not limited to the construction/upkeep of the fences and permissive use of the property, as disclosed to the Defendants through the depositions of Vikki Stamm and Douglas Stamm on July 10, 2013." The trial court considered the notices given, received written arguments of the parties, and performed research on the residual hearsay exception. Ultimately the court found the statements did not fall under the exception and they were excluded.

Using the factors affecting trustworthiness set forth above, we note the alleged statements were oral and they were not made under oath or subject to cross-examination. Rubye Faye and Grover were both deceased prior to the filing of this action, so they would not have had motive to speak untruthfully; however the conversations Stamm sought to introduce were elicited as part of her duties as the trustee for the property and it is unclear whether leading questions were used in reference to the Fishers' use of the property. At the time of the alleged conversations, Stamm knew that she would inherit the property. Further, the notice of intent did not identify specific statements, instead it referred only to the subject matter discussed in the depositions of Vikki and Douglas Stamm.

In addition, the depositions contain very few specific statements attributed to Rubye Faye and Grover. Instead, Vikki and Douglas Stamm's depositions recounted their recollection of

- 6 -

conversations and interpretation of the Stubbs' statements. The trial court could properly determine that the trustworthiness of the evidence was lacking. We therefore conclude that the district court did not abuse its discretion in determining that conversations with Rubye Faye and Grover were not admissible under the residual hearsay exception and that the court did not err in excluding the contents of the conversations as inadmissible hearsay.

*Adverse Possession.*

Stamm asserts the trial court erred in finding that the Fishers gained possession of the contested strip of land through adverse possession.

Adverse possession requires that the party claiming title under this theory must prove actual, continuous, exclusive, notorious, and adverse possession under a claim of ownership for the ten-year period. *Wanha v. Long,* 255 Neb. 849, 587 N.W.2d 531 (1998).

It has long been the law in Nebraska that a fence can establish a boundary after a ten-year period. In *Olson v. Fedde,* 171 Neb. 704, 107 N.W.2d 663 (1961) the court stated:

It is the established law of this state that, when a fence is constructed as a boundary line between two properties, and the parties claim ownership of the land up to the fence for the full statutory period and are not interrupted in their possession of control during that time, they will, by adverse possession, gain title to such land as may have been improperly enclosed with their own.

The district court's order noted that the problem here is there are differing accounts of the facts regarding the fence that ran north to south on the contested land. Several witnesses testified the fence existed before 1950, while others claim it was built around 1967. There are differing accounts regarding the quality of the fence and the purpose that it served. The district court found that the credible evidence was that in the 1960s Grover Stubbs erected a north-south fence along the line where the change in elevation from west to east was 2 to 3 feet, lower to the west and higher to the east. From the time this fence was built, Stamm and her predecessors farmed the land to the west up to the fence with a turn row on the easternmost edge. The Fishers and their predecessors farmed the land immediately to the east of the fence with a field drive or turn row abutting the westernmost edge.

There is also some ambiguity regarding the use of an electric fence constructed seasonally by Stamm and the Stubbs to the east of the north-south fence to keep cattle contained. Stamm testified that the electric fence was placed 5 to 10 feet east of the north-south fence. Ryan Fisher testified that the field drive was immediately to the east of the north-south fence and was 13 to 15 feet wide, which would mean the electric fence would be in the middle of the field drive. Several witnesses, including the Fisher family testified that they had not seen an electric fence used on the Stamm property at any point in time. There is no evidence that Stamm or her predecessors used any land east of the alleged electric fence at any time.

It is undisputed that by 2000 or as early as 1997, Stamm's predecessors stopped running cattle on the Stamm property, which eliminated any need for an electric fence on the property. Stamm's testimony revealed that between 1997, when her uncle Grover Stubbs became ill, until 2012 when the land was surveyed, Stamm and her predecessors did not use the contested land. The

land to the east of the north-south fence was used solely by the Fishers for raising crops, as they had done continuously from the 1980s to the present. When the north-south fence was removed in 2006 or 2007, Stamm and the Fishers continued to farm the land in the same way it had been prior to the removal.

The trial court concluded the placement of the fence originally may have been a placement of convenience due to the change in elevation near the fence. However, the court, taking the evidence in the light most favorable to Stamm, found she had only used approximately 5 to 10 feet to the east of the north-south fence for the erection of the electric fence, and she ended her practice of erecting the fence as early as 1997. The court found that Stamm had abandoned the use of the contested land, and from 1997 to 2012, the Fishers' possession of the contested land was actual, continuous, exclusive, notorious, and adverse under a claim of ownership for the ten-year statutory period.

Actual occupancy or possession is always involved in any claim to land by adverse possession. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). The acts required to prove actual possession depend on the character of the land and the use that can be reasonably made of it. *Nenneman v. Rebuck,* 242 Neb. 604, 496 N.W.2d 467 (1993). In this case, the land was agricultural in nature. Though the Fishers may not have constructed the fence, they used and maintained the land immediately to the east of the fence continuously since the fence was constructed, and continued to use it for the same purposes after the fence was removed. It is not necessary that a party prove a complete enclosure or that he remain continuously on the land for the statutory period, but that the land be used continuously for the purposes to which it was by its nature adapted. *Wanha v. Long,* supra, citing *Jones v. Schmidt,* 170 Neb. 351, 102 N.W.2d 640 (1960). We conclude the Fishers actually and continuously possessed the disputed property for a period of at least 10 years.

The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Gustin v. Scheele,* 250 Neb. 269, 549 N.W.2d 135 (1996). If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that generally will be sufficient to establish that possession was notorious. *Wanha v. Long,* supra. Although the enclosure of land renders the possession of land open and notorious, and tends to show that it is exclusive, it is not the only way which possession may be rendered open and notorious. The fact that one claiming title by adverse possession never intended to claim more land than is called for in his deed is not a controlling factor. P*erdum v. Sherman,* 163 Neb. 889, 81 N.W.2d 331 (1957). The court can look at the intent with which possession is held, and the improvements or appropriation of the land for other useful purposes to show open and notorious possession.

Like in *Wanha,* the Fishers considered the fence to be the boundary line and considered themselves the possessors of all of the land to the east of the fence. The Fishers' use of the land was conspicuous, they used the land immediately to the east of the fence as a field drive, and farmed the land immediately to the east of the field drive. Their use of the land would be obvious to observers. The Fishers also constructed a well on the disputed property to irrigate their crops in 1975. There was testimony that nothing prevented them from moving the well further to the east,

but the Fishers believed the land was theirs, and the proposed location of the well was appropriate and well-suited to service their land.

The claim of adverse possession is founded upon the intent of the occupant, such intent being determined by his acts. *Wanha v. Long,* supra. Intent, even though mistaken, is sufficient where the claimant occupies the wrong line believing it to be true, even though he does not intend to claim more than that described in the deed. *Id.* The Fishers testified that they believed the land to the east of the north-south fence belonged to them and they had always operated as if it did. The evidence clearly indicates the Fishers believed that the property was theirs, and treated it as such, by using a portion as a field drive to access their property and the irrigation well, as well as farming a portion of the land.

The Nebraska Supreme Court has addressed situations where neither party considered a misplaced fence the boundary, and found that where neither party considers the fence a boundary, it does not constitute evidence of adverse possession. The law is clear that the placement of a fence within one's boundary line does not lead to the relinquishment of ownership of lands outside the fence through adverse possession without an additional showing that those lands outside the fence have been used by the neighboring landowner under a claim of ownership for the requisite period of time. *Gustin v. Scheele,* supra. It is not required that both parties consider the fence a boundary, rather it is the adverse possessor's intent that is relevant. *Wanha v. Long,* supra. In this case, the Fishers testified that the fence was treated as a boundary, and they believed the land belonged to them. It was their intent to possess the land and continue using it as they had for several decades.

Stamm asserts the Fishers' use of the property was permissive, as the Fishers were friends with the Stubbs and using the property with Grover's permission. However, as previously discussed, Stamm's conversations with her deceased aunt and uncle regarding the use of the property are hearsay and are not subject to any permissible hearsay exception, thus there is no evidence in the record to suggest the use was permissive, rather than adverse.

Based upon our de novo review, and giving due weight to the trial court's findings made following a bench trial, we find the Fishers established their adverse possession of the disputed property by a preponderance of the evidence.

*Stamm's Theory of Ejection, Motion for Injunction.*

Stamm asserts the trial court erred in finding against her theory of ejectment under Neb. Rev. Stat. §25-2124 et seq. She asserts that, as she holds legal title to the real estate, she has the right of possession to the real estate. She also asserts the trial court erred in overruling her motion for an injunction.

To maintain an ejectment action, a plaintiff must show a legal interest in the property, entitlement to possession therein, and that the defendant unlawfully keeps the plaintiff out of possession. *Curtis v. Giff,* 17 Neb. App. 149, 757 N.W.2d 139 (2008). An action for ejectment may be defeated on equitable grounds, but for a defendant to prevail, his equitable title must be superior to that of the plaintiff's. *Miller v. Radtke,* 230 Neb. 561, 432 N.W.2d 542 (1988).

The Fishers' answer and counterclaim asserted that they had fulfilled the statutory requirements to gain title through adverse possession and, therefore, Stamm was estopped from claiming title to the real estate. Having found the trial court did not err in finding the Fishers'

adversely possessed the property for the statutory period prior to the filing of this action, we also find the trial court did not err in finding against Stamm's theory of ejectment as the Fishers had superior title in the contested property. For the same reasons, we also find the trial court did not err in overruling Stamm's motion for an injunction which would bar the Fishers from entering upon the disputed property.

*Damages.*

The trial court found Stamm should be reimbursed for taxes accrued and paid on the disputed property from 2009 to 2013. Stamm asserts the trial court did not err in awarding damages, but did err by restricting her recovery to the four years prior to filing the case, and finding earlier claims would be barred by the statute of limitations. She asserts the bar of a statute of limitations is an affirmative defense which must be pled, and the Fishers failed to plead the affirmative defense. Therefore, she asserts the trial court could not limit the award of damages with the statute of limitations.

The Fishers' answer and counterclaim states "defendants state that all or a portion of plaintiff's claims are barred by the applicable statute of limitations." Under § 25-207, actions for trespass, conversion, other torts and fraud can be brought within four years. The earliest filing in the record in this case is dated February 25, 2013, so Stamm would be limited to only those damages which accrued after February 25, 2009. The record shows that the affirmative defense was pled by the Fishers, and that the applicable statute of limitations was applied. We find this assignment of error is without merit.

*Legal Description.*

Stamm asserts the trial court provided the parties with an inadequate and inaccurate legal description. She also asserts the legal description provided to the court was incorrect, as it included areas to which the Fishers did not make a claim, and portions which were not enclosed by the north-south fence.

Stamm cites *Sawtell v. Bel Fury Investments Group, L.L.C.,* 19 Neb. App. 574, 810 N.W.2d 320 (2012) in support of her assertion that the Fishers did not provide an adequate legal description of the contested real estate. In *Sawtell,* we held that proof of the adverse nature of the possession of the land is not sufficient to quiet title; the land itself must also be described with enough particularity to enable to the court to exact the extent of the land adversely possessed and enter a judgment upon the description. *Id.*

Stamm appears to assert the legal description contained in Exhibit 101 was not "closed" as it included land that was not enclosed by the north-south fence. However, the requirement that a legal description be "closed" does not mean the land must be actually enclosed, it simply means that the description is sufficiently descriptive to figuratively enclose a parcel within the defined boundaries. See *First Federal Sav. And Loan Ass'n of Lincoln v. Thomas,* 230 Neb. 465, 432 N.W.2d 222 (1988) The legal description provided is drawn by starting at a point on the southeastern corner of the disputed property, traveling to the east, north, west, and south for defined distances before ending at "the place of beginning." Based upon our review of the record, we find the legal description provided contains a closed parcel of land and is not ambiguous.

Stamm also asserts the trial court should not have awarded the Fishers with the approximately 60 feet north of the north-south boundary fence because it was never enclosed by the fence, and because the Fishers "did not attempt to have any adverse claim to that property." She also asserts the Fishers did not establish any evidence that they used any of the land north of the north-south fence beyond the cottonwood tree. The evidence shows the Fishers included the northernmost property totaling approximately 60 feet along the boundary line surveyed by Mitchell Humphrey in their counterclaim. Ryan Fisher also testified that the fence extended to the Wood River to the north, and that he farmed some property north of the Wood River on the contested strip of land. The metes and bounds of the property the Fishers claimed were clearly marked in their counterclaim, and did not rest merely on speculation and conjecture. See *Inserra v. Violi,* 267 Neb. 991, 679 N.W.2d 230 (2004). Therefore Stamm's assertion regarding the property north of the cottonwood tree is without merit.

*Cross-Appeal.*

In its order, the trial court excluded the land to the south of the iron remnant which was used in creating the survey of the contested property. The Fishers' cross-appeal asserts the trial court erred by modifying the legal description of the contested real estate by changing the southern boundary line to include only the land that had previously contained portions of the north-south fence.

Stamm asserts the Fishers' must fail in their claim because the land was not enclosed by the north-south fence. However, the Nebraska Supreme Court has found that evidence of a discernable fence line could be used to provide a sight line establishing an observed boundary, even though the fence had been removed. *See Schellhorn v. Schmieding,* 288 Neb. 647, 851 N.W.2d 67 (2014). See also *Cox v. Spainhower,* 249 S.W.2d 719 (Kentucky 1952) (Kentucky Court of Appeals found a fence extending over half the distance of the disputed boundary was sufficient to establish the direction of the boundary.); *Heriot v. Lewis,* 35 Wash. App. 496, 668 P.2d 589 (1983); *Orton v. Carter,* 970 P.2d 1254 (Utah 1998).

The Fishers assert the evidence revealed that until 1975, when the well was drilled on the property, the north-south fence ran all the way south to 175th Road. They assert that a portion of the fence was subsequently removed and the north-south fence no longer extended to the south boundary, but that the land was still used by Ryan and Bradley Fisher and their predecessors in interest. The evidence shows that during the time when the court determined the Fishers established adverse possession of the contested property, namely 1997 to 2012, the Fishers also used the southern 30 feet of the contested property north of 175th Road. Once the well was drilled in 1975, the Fishers used this portion of land to gain access to the contested property and the well as well as their land via the field drive, which abutted the east side of the north-south fence. We find the Fishers have shown sufficient use of the southern property, and the trial court erred in determining the Fishers were not entitled to title in the southern 30 feet of the contested property.

We therefore adopt the legal description as submitted to the trial court in Exhibit 101 which describes:

A tract of land being a part of the Southwest Quarter of the Southeast Quarter (SW1/4 SE1/4) of Section Seven (7), Township Ten (10) North, Range Seventeen (17) West of the

- 11 -

Sixth Principal Meridian, Buffalo County, Nebraska, more particularly described as follows: Beginning at the Southeast Corner of the Southwest Quarter of the Southeast Quarter of Section 7 and assuming the East line of the Southwest Quarter of the Southeast Quarter of Section 7 as bearing N 00º03'26" W and all bearings contained herein are relative thereto; thence N 00º03'26" W and on the East line of the Southwest Quarter of the Southeast Quarter of said Section 7 a distance of 1338.16 feet to the Northeast Corner of the Southwest Quarter of the Southeast Quarter of said Section 7; thence N 89º37'16" W and on the North line of the Southwest Quarter of the Southeast Quarter of said Section 7 a distance of 42.77 feet; thence leaving the North line of the Southwest Quarter of the Southeast Quarter of said Section 7, S 01º20'40" E a distance of 1338.68 feet to a point on the South line of the Southwest Quarter of the Southeast Quarter of said Section 7; thence S 89º23'43" E and on the South line of the Southwest Quarter of the Southeast Quarter of said Section 7 a distance of 12.67 feet to the place of beginning. Containing 0.852 acres, more or less, of which 0.010 acres, more or less, are presently being used for road purposes on the South side.

## CONCLUSION

We affirm the trial court's determination that the Fishers obtained title of the disputed property through adverse possession, and we affirm the judgment against the Fishers for the value of the real estate taxes paid by Stamm for the four years preceding this action. We find the trial court erred in determining the Fishers did not gain title of the southernmost 30 feet of the contested property by adverse possession, and we modify the legal description of the property as set forth above.

AFFIRMED AS MODIFIED.