CECIL ROBERT HALLOWELL ET AL., APPELLEES, v. GEORGE R. BORCHERS ET AL., APPELLANTS.

34 N. W. 2d 404

Filed November 5, 1948. No. 32436.

*Fischer, Fischer & Fischer,* for appellants.

*Swarr, May, Royce, Smith & Story* and *Robert K. Andersen,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action to quiet title in plaintiffs to certain strips of disputed land described in their amended petition, and to enjoin the defendants from entering upon such land and committing damage thereon.

For convenience appellants will be referred to under their original designation as defendants, and the appellees as plaintiffs.

On or about April 26, 1919, the plaintiffs purchased Lots 15 and 16 in Benson Acres, an addition to the city of Omaha, and immediately went into possession. Plaintiffs allege in their amended petition that for

several years prior to April 1919, the exact time being unknown to them, the owners of Lots 15 and 16 above described had occupied and cultivated along with said lots, narrow strips of land on the north and west thereof, described as follows: "Commencing at the northeast corner of Lot 14, thence southerly along the east line of Lot 14, 248.1 feet more or less to the southeast corner of Lot 14; thence westerly along the south line of Lot 14, 15 feet; thence northerly on a straight line intersecting the north line of Lot 14 5 feet west of the northeast corner of Lot 14, 254.3 feet more or less to a point 6.8 feet beyond the north line of Lot 14; thence easterly 241.0 feet more or less to the east line of Lot 17 at a point 20 feet from the southeast corner of Lot 17; thence southerly along the east line of Lot 17, 20 feet to the southeast corner of Lot 17; thence westerly along the south line of Lot 17, 247.1 feet more or less to the point of beginning." The total of the disputed strips of land is approximately one-tenth of an acre.

Plaintiffs further allege they believed and understood that they had purchased all of the land as herein described; that they and their predecessors in title before and since April 1919 have been in the actual, open, notorious, exclusive, continuous, and adverse possession of the described land and by virture thereof are the owners of the fee title.

The defendants purchased Lots 13, 14, and 17 in Benson Acres on September 30, 1946, and moved on the land in February 1947. Lot 14 adjoins the plaintiffs' property on the west, and Lot 17 on the north.

Defendants' answer denied adverse possession of the strips of land in dispute, in the plaintiffs, and alleged that plaintiffs only claimed land they purchased extended to the actual boundary lines. In October 1946, defendants had a survey made of Lots 13, 14, and 17. Subsequently the same surveyor made a survey for the plaintiffs, which included the disputed strips of land in question, designated as the "claimed" boundaries of the

plaintiffs. The plaintiff Maud Hallowell accompanied the surveyor and pointed out certain objects around what she considered to be the boundary lines. Exhibit 1, in evidence, is a plat drawn to scale, which shows the actual boundary lines, and the disputed strips of land as claimed which, according to the original survey, was considered an encroachment over the actual boundary lines.

When the plaintiffs first purchased their land it was in alfalfa and had a three-room stucco house on it. The land adjoining it on the north was a plot of land full of weeds, as was the land to the west of them. Plaintiffs' land was left in alfalfa for a year or so. Thereafter the plaintiffs made garden, planted fruit and other trees, and sowed grass seed. At that time and since, the plaintiffs have considered the boundary of their land to the north at the edge of the alfalfa which separated their land from other acreage. The alfalfa gradually died out and blue grass grew in place of it. To the north where this occurred, plaintiffs called this land the "meadow," and that is where they planted the trees, most of which were Russian olives, which they refer to as the hedge. The trees along the claimed boundary line are somewhat irregular, not being in an exact straight line. The plaintiffs located their boundary line on the west by the edge of the alfalfa on their place.

Plaintiffs at all times cultivated what they considered to be their own land within the boundary of the lines claimed. The land to the north and west of plaintiffs' land has been cultivated at different times throughout the years that the plaintiffs occupied their land. The persons cultivating the adjoining land stopped planting and plowing at the claimed boundary lines thereof, and on the west have always left a ditch, until the defendants' plowman plowed it up in the spring of 1947. This ditch was a distinct and straight line until it was filled in. On the north claimed boundary line they left a furrow which

the plaintiffs kept dug out to keep the water from running over their meadow.

In 1931, the plaintiffs put a chicken-yard fence within a few inches of the north claimed boundary line enclosing a part of the disputed strip of land, and erected a chicken house in the northwest corner of the chicken yard. In 1933, maple trees were planted in the chicken yard. In 1935, plaintiffs planted Russian-olive trees along the claimed boundary line on the north, some of which were destroyed by drought in the following year, and some on occasion of a fire. Some of the trees remaining are of a height of five to six feet. Other trees and shrubs appear along the north and west claimed boundary lines.

The plaintiff Cecil Robert Hallowell testified that he planted most of the trees on their land, and kept the grass to the north claimed boundary line mowed at all times. He corroborated the foregoing facts.

A witness who cultivated the lots now owned by the defendants for a period of three years until 1932, and who is familiar with the plaintiffs' property as it appears at the present time, testified that the north part of the plaintiffs' property was in blue grass, and he cultivated close to what he supposed to be the boundary line, 18 to 20 inches north of the Russian-olive hedge. Along the west of the plaintiffs' property where he cultivated, there was a small ditch and he kept on the west side of this ditch. It looked to him that at the present time the ditch had been filled in. There were trees just east of where he cultivated. He located the boundary line from where it had been plowed out.

The plaintiff Maud Hallowell testified that the first time she knew that the plaintiffs had been using any ground outside of their own property was in the fall of 1946 when a survey was made by direction of the defendants. She was "dumfounded" to learn these facts, and thereafter offered to purchase the disputed strips of land from the defendants for the amount of $200, because the plaintiffs did not want trouble with their neighbors.

Plaintiff Cecil Robert Hallowell further testified that when the plaintiffs entered upon their land they made no inquiry as to the boundary lines of the property, did not do so at any time subsequent thereto, and actually learned where the true boundary line was when the defendants' survey was made. He thought the boundary of his property was the claimed boundary lines on the north and west thereof. On occasions when friends visited, plaintiffs would show them the boundaries of their land, which were as shown on exhibit 1 as the claimed boundary lines. Other witnesses corroborated the foregoing testimony.

The defendant George Borchers testified that when the defendants purchased their land it consisted mostly of weeds, and they were unable to determine where the boundary lines were so decided to have it surveyed. A short time after the survey the defendants went to see the plaintiffs at their residence. This witness informed plaintiffs that evidently, without their knowing it, they were occupying some of the defendants' land, and suggested if they had any trees to save, the fall of the year would be the right time to transplant them; that they intended to put in a fence and have the whole thing plowed up and used. The plaintiff Cecil Robert Hallowell seemed to be agreeable; his wife, Maud Hallowell, did not want a fence between the properties. This witness told them that if they were not satisfied, they could have the land surveyed. At that time the plaintiffs made no claim to any land other than that which constituted the true boundary line between the properties. Defendants, under advice of counsel, proceeded to prepare to construct a fence on the true boundary line.

With reference to the chicken-yard fence, plaintiff Cecil Robert Hallowell testified that the defendant George Borchers asked him to move the fence in order that a survey could be had of the land, so this plaintiff took the fence down and moved the chicken house. The plaintiff Maud Hallowell testified that when the survey

was made and the plaintiffs found that the fence was over the actual boundary line which they had always thought was their acreage, they moved the chicken-yard fence at the request of the defendants, to bring the line in. After they consulted counsel they put the fence in exactly the position it had been in before. The defendants thereafter cut the wire and took the fence up. The defendant George Borchers testified that in a conversation with the plaintiff Cecil Robert Hallowell the Sunday after the survey was made that Mr. Hallowell agreed that the chicken fence and chicken house were over the line and that he would move them. At any rate, he did move them. The plaintiffs, at the request of the defendants, also removed some debris in the disputed strip of land to the west.

Plaintiffs' counsel wrote a letter to the defendants informing them that they had trespassed on the plaintiffs' land and caused damage thereon, and to refrain from any such acts in the future. The defendant Lois Borchers was engaged in cutting down trees on the disputed strip of land on Decoration Day, 1947. This was after the defendants had received the letter.

A witness engaged in the nursery business produced a list of trees alleged to have been destroyed by defendants, and estimated the cost of replacing trees which were destroyed on Decoration Day to be in the amount of $144.05. Plaintiffs testified that by virtue of the destruction of the trees by the defendants, they were damaged to the extent of $200. Most of the trees planted by the plaintiffs were seedlings and apparently were obtained at no expense.

The trial judge inspected the premises.

The trial court quieted title in the plaintiffs to the land as described in their petition, finding that plaintiffs, for the full statutory period prior to the time defendants acquired their property, had acquired the disputed strips of land by adverse possession; enjoined the defendants from entering upon said land and from in any manner

damaging or destroying any trees, shrubs, sod, or fences thereon; finding further that the plaintiffs suffered no damage and allowed no recovery therefor, and that each party should pay their own costs. Thereafter defendants perfected their appeal to this court.

This jurisdiction is committed to the rule: "The plea of title to land by adverse possession, to be effective, must be proved by actual, open, exclusive and continuous possession under claim of ownership for the full statutory period of ten years." Ellsworth Corporation v. Stratbucker, 134 Neb. 246, 278 N. W. 381. See, also, Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737; Wells v. Tietge, 143 Neb. 230, 9 N. W. 2d 180, 161 A. L. R. 1167.

It is the defendants' contention that under the facts as heretofore related the plaintiffs had no intention at any time to claim the disputed strips of land by adverse possession. In this connection, the case of Colvin v. Republican Valley Assn., 23 Neb. 75, 36 N. W. 361 is cited: "The possession must not only have been actual, open, and continuous, but it must have been accompanied by an intention on his part to hold the land as the owner of it. It must have been under a claim of ownership. No matter how exclusive and hostile to the real owner, in appearance, it cannot be effectually adverse, unless accompanied by the intent, on the part of the plaintiff in error, to make it so. A naked possession, unaccompanied with any claim of right, will never constitute a bar, but will inure to the advantage of the real owner."

In the above cited case there was evidence as to who should remain in possession. The plaintiff's memory was somewhat defective and the purchaser of the land was dead. This court, from the record, determined that it was reasonably clear that the plaintiff in error retained the possession by the consent of the purchaser, without any purpose of asserting ownership, or claiming to own it, until after a certain time. We mention the foregoing to show that the facts are very much dissimilar from the

facts in the instant case and, as will be shown later, the case is not applicable to the case at bar.

In the case of Obernalte v. Edgar, 28 Neb. 70, 44 N. W. 82, this was an action of ejectment for a narrow strip of land one-half mile long, 73 links wide at one end and running to a point at the other. The plaintiff charged in his petition that the defendant was keeping him out of possession of this strip of land. The defendant admitted the charge and claimed that he was not only then in possession of said land, but had been in possession continuously for a sufficient length of time to give him the title thereto by adverse possession. There was apparently no dispute between the parties as to the true boundary lines, or corners, as they originally existed with reference to the disputed land. It is apparent the land was not fenced. The trial court instructed with reference to the rule as to what constitutes adverse possession, and further instructed that to constitute adverse possession it must appear that what was done by the person claiming title thereunder was not done with the permission of the owner but was done under a claim of right in himself and recognizing no right in the real owner; and not done through inadvertence or mistake, but under a claim of right in himself and in hostility to the right and possession of the owner; further, that the actual possession of land may arise in many different ways, and in any of the different ways of improving it which are open and notorious in character, which show an intention to appropriate to some useful purpose - that is, by enclosing by fence, erecting buildings, planting groves or trees - going to indicate the appropriation of the property of the parties claiming to own it.

There is evidence that the plaintiffs offered to purchase the disputed strips of land from the defendants. While this point is not raised in this court, it is well to point out that in Oldig v. Fisk, 53 Neb. 156, 73 N. W. 661, it is said: "It is generally conceded that one may purchase an outstanding title to 'buy one's peace' or pre-

vent threatened litigation. There is no room to distinguish in this behalf, between litigation threatened by word of mouth, and litigation threatened by the fact that the title is outstanding, - a constant menace from the very fact of its existence. * * * In buying what is outstanding there is nothing partaking of the nature of an acknowledgment of the superiority of that title or an abandonment of one's former claim. The old title is not conveyed away or lost. Such an act admits, and admits only, that the occupant deems it worth while to get rid of the outstanding title and unite it to the one under which he has been holding. It does not prove, and alone it does not even tend to prove, a change in the character of the possession or a recognition of a title paramount."

It is also the defendants' contention that the claimed boundaries are not sufficiently well defined; that under the law of Nebraska the adverse claim must be to fixed monuments and to certain lines; that in the survey made for the plaintiffs, the plaintiff Maud Hallowell established an arbitrary line which included what she wanted to include, with utter disregard to the ground to which the plaintiffs' claim they had been doing acts of adverse possession; that under the evidence, assuming the plaintiffs had been claiming any of the land for over ten years, where is the boundary line to which they have been claiming? Where are the fixed monuments? The defendants contend that the only case that constitutes an exception in such respect is Brownfield v. Bleekman, 4 Neb. (Unoff.) 443, 94 N. W. 714.

The bulk of the Nebraska cases involve disputed boundaries, and in most of these cases the land claimed by the adverse possessor was enclosed by him or occupied by him up to a fixed monument, such as a road or a ditch. In Tex v. Pflug, 24 Neb. 666, 39 N. W. 839, it is said: "If one by mistake inclose the land of another and claim it as his own to certain fixed monuments or boundaries, his actual and uninterrupted possession for

the statutory period will work a disseizin and his title will be perfect." The statement is repeated in Levy v. Yerga, 25 Neb. 764, 41 N. W. 773, Obernalte v. Edgar, *supra,* and other cases.

In Brownfield v. Bleekman, *supra,* this court said, in speaking of Tex v. Pflug, *supra,* Levy v. Yerga, *supra,* and Obernalte v. Edgar, *supra:* "It is true, in the three cases cited, the rule is announced in the same language and reference is made to fixed monuments and the inclosure of the land; but that the inclosure of the land is not an essential element of the rule, appears from the fact that, in the last of the cases cited, it does not appear the land was inclosed. (See Obernalte v. Edgar, *supra.*) The importance of the inclosure in any case, we think, is due to the fact that it renders the possession open and notorious and tends to show that it was exclusive. That this is not the only way by which possession may be rendered open and notorious is clear from one of the instructions, approved in *Obernalte v. Edgar, supra,* whereby the jury were instructed that 'the actual possession of the land may arise in many different ways, and in any of the different ways of improving it which are open and notorious in their character, which show an intention to appropriate to some useful purpose - that is, by inclosing by fence, erecting buildings, planting groves or trees - going to indicate an appropriation of the property of the persons claiming to own it.' "

In this connection we make reference to Obernalte v. Edgar, *supra,* as appears above.

The defendants seek to distinguish Brownfield v. Bleekman, *supra,* from other Nebraska cases involving the same subject matter and from the instant case, on the grounds that in Brownfield v. Bleekman, *supra,* the stipulation appearing therein constituted agreement on the facts, and the land was described with mathematical accuracy in the petition and boundary lines were apparently clear and definite, which is not true in the instant case. The stipulation as appears at p. 445, sum-

marized, dealt with the possession of the disputed land but was not effective as against testimony offered in the case aside from the stipulation.

In the instant case the amended petition of the plaintiffs described the disputed strips of land and the claimed boundary lines thereof with mathematical accuracy. The evidence discloses that during all the time from 1919 to the present, the boundary to which the plaintiffs have occupied and claimed was easily recognized. The reasoning in Brownfield v. Bleekman, *supra,* from a practical standpoint is the same as in Obernalte v. Edgar, *supra.* We adopt the reasoning and conclusion in Brownfield v. Bleekman, *supra,* as the same applies to the instant case.

With reference to the testimony of the defendants to the effect that the plaintiffs made no claim to any other land than to the true boundary line, and other evidence of similar import heretofore appearing in the opinion, we might well add that it is clear that not too much importance should be attached to what an occupant may claim on the witness stand on this point, particularly when it is apparent that his testimony is altogether inconsistent with his acts and conduct during the period of his possession. Any honest witness, unless coached by counsel, would be likely to answer a question as to whether he claimed more than to the true boundary in the negative, and would not be likely to think of qualifying it by stating that the true boundary of which he speaks is the boundary as appears to him to be the true one. Hence, while we do not want to go so far as to hold that such testimony should not be taken into consideration in determining the true facts of the case, it is clear that to have a case depend entirely upon what might become a mere verbal quibble is dangerous and subversive of rights. Testimony that he claimed only to the true boundary may, in connection with acts of possession, aid in determining what the character of possession was, and whether thereby the true owner has been advised that adverse possession is claimed. See City of

Rock Springs v. Sturm, 39 Wyo. 494, 273 P. 908, 97 A. L. R. 1. See, also, Daily v. Boudreau, 231 Ill. 228, 83 N. E. 218, in which, apparently, the testimony of the occupant that he never intended to claim more land than · called for by ·his deed was given no weight whatever.

In Bond v. O'Gara, 177 Mass. 139, 58 N. E. 275, 83 Am. S. R. 265, it was said that the law should· choose the intention ·directed towards the physical object rather than the intention to hold in accordance with the deed.

In Anderson v. Richards, 100 Or. ·641, 198 P. 570, the court said: "Adverse possession is founded upon the intent with which the occupant has ·held possession, and this intent is to be determined by what he has done: * * * ".

An annotator, in speaking of .possession as indicating adverse claim, said: "In a steadily increasing number of jurisdictions, the possession is the important element, and it is held that such possession is·not the less adverse because the person takes possession of the land in question innocently and through mistake. In other words, it is the visible and adverse possession, with an intention to possess land occupied under a belief that it is the possessor's own, that constitutes its adverse character, and not the remote view or belief of the possessor. Or, as said in 1 R. C. L. 733, 'the mere fact of possession is allowed to override the intention; and it is held that a possession beyond the true boundary lines, irrespective of the intention with which it was taken, becomes adverse.' " 97 A. L. R. pp. 58, 62. Under this annotation are a number of Nebraska cases, Tex v. Pflug, supra, Levy v. Yerga, supra, Obernalte v. Edgar, supra, and Brownfield v. Bleekman, supra, cited in this opinion, together with others unnecessary to cite.

In view of the evidence and the foregoing authorities, it is apparent that in the instant case the plaintiffs, from and after April 26, 1919, made improvements on their own land of a substantial character and on the

disputed strips of land by planting trees and shrubs thereon more than ten years prior to any assertion of claim made to the disputed strips of land by the defendants. The performed acts with reference to the disputed strips of land were such as are usually performed by owners, and constitute evidence of claim of title. For actual possession, no particular act is required. What is sufficient to meet the requirements depends upon the character of the land and all of the circumstances of the case. We believe that the evidence in the instant case supports the judgment of the trial court, and it was not in error in determining adverse possession to the disputed strips of land in the plaintiffs.

The plaintiffs cross-appeal, contending the trial court erred in refusing to allow treble damages for willful trespass by the defendants onto the plaintiffs' land and committing damage to their property.

Section 25-2130, R. S. 1943, provides in substance that for willful trespass, injuring any trees or shrubs on the land of another, for any purpose whatever, the trespasser shall pay treble damages at the suit of any person entitled to protect or enjoy the property aforesaid. In this connection, the plaintiffs rely on a letter written by their counsel on May 10, 1947, the substance of the contents of which appear heretofore in the opinion. On May 30, 1947, one of the defendants entered onto the "claimed" boundary line and proceeded to chop down trees in preparation for the construction of a fence on the true boundary line as determined by defendants' survey. In doing this, it is apparent the defendants relied on their deed of conveyance describing the land they purchased, and on their survey and the advice of their counsel. Obviously, the letter written by plaintiffs' counsel to the defendants is not conclusive of the defendants' legal rights in the matter. The action of the defendants in such respect did not constitute a willful trespass. "Willfully," as used in connection with an act forbidden by law, means that the act must be

done knowingly or intentionally, and that the act was committed with knowledge, and that the will consented to, designed, and directed the act. See Woodhouse v. Railway Co., 67 Tex. 416, 3 S. W. 323. If the defendants violated the law, it appears to be in the honest and reasonable belief of the defendants that they were acting within their legal rights, and their conduct was rightful. See, State v. Shevlin-Carpenter Co., 102 Minn. 470, 113 N. W. 634; King v. Merriman, 38 Minn. 47, 35 N. W. 570. We conclude that there was no error made by the trial court as contended by the plaintiffs in such respect.

The plaintiffs contend the trial court erred in not allowing them actual damage for the alleged trespass onto their land; that in the absence of treble damages, actual damage for trespass should be allowed. The plaintiffs' evidence is to the effect that to replace the trees and shrubs destroyed by the defendants would cost $144.05. Plaintiffs testified the value of the trees and shrubs, that is, watering and caring for them, amounts to $200. It is apparent from the record that most of the trees were transplanted seedlings, and other items that were planted cost the plaintiffs nothing. The trial court inspected the premises and obviously determined that the damage was of such trivial significance that no recovery should be had. We conclude the evidence does not sustain any actual damage of a significant nature, and that the trial court did not err in its judgment in refusing to allow actual damages.

The plaintiffs further contend the trial court erred in finding and adjudging that each party pay their own costs. Plaintiffs cite section 25-1708, R. S. 1943, which provides: "Where it is not otherwise provided by this and other statutes, costs shall be allowed of course to the plaintiff, upon a judgment in his favor, in actions for the recovery of money only, or for the recovery of specific real or personal property."

Section 25-21,119, R. S. 1943, provides, in substance,

for assessing of costs where one or several defendants appear and disclaim title, lien, or interest adverse to the plaintiff, such defendant shall recover costs. In other cases the costs shall abide the final decree, judgment or order in the action.

The court's decree and judgment in the instant case quieted the title to specific strips of land in the plaintiffs by adverse possession. Within the contemplation of the afore-cited statutory provisions, in a suit to quiet title in persons claiming adverse possession to specific real property, the costs follow the judgment. We affirm the judgment of the trial court, with the exception of assessing costs as hereinbefore determined, and with reference to the costs that part of the judgment should be reversed and the cause remanded with directions to tax all costs to defendants.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.