F & J Enterprises, Inc., a Nebraska corporation, appellee,
v. James W. DeMontigny and Betty Jane DeMontigny,
appellants.

573 N.W. 2d 153

Filed December 16, 1997.   No. A-96-623.

Dixon G. Adams, of Adams and Sullivan, for appellants.

James E. Lang, of Laughlin, Peterson & Lang, for appellee.

Miller-Lerman, Chief Judge, and Sievers and Mues, Judges.

Mues, Judge.

## INTRODUCTION

F & J Enterprises, Inc., brought action against James W. DeMontigny and Betty Jane DeMontigny to quiet title to certain real property located in Sarpy County, Nebraska. The DeMontignys filed a cross-petition, alleging that they were the owners of the property in dispute by virtue of having adversely possessed the property for a period of more than 10 years. The trial court found that the DeMontignys failed to prove that they had adversely possessed the property under a claim of ownership and quieted title in F & J Enterprises. The DeMontignys now appeal that judgment. For the reasons set forth below, we reverse, and remand with directions.

## BACKGROUND

In 1963, the DeMontignys bought 2 acres of land from Max Pixel. At the time of the purchase, Pixel also owned the property to the south and the west of the DeMontignys (hereinafter Pixel property). Pixel's house was located to the south of the DeMontignys' property. The property now in dispute, 1 acre of land, is on the southern border of the DeMontignys' property and is situated between the DeMontignys' property and the land Pixel owned. A visual representation will help explain further facts:

X - the DeMontignys' House

| A | B |
|---|---|
| C | D |

X - Pixel's House

The area within points A, B, C, and D is the acre which is the subject of this quiet title action. Points A and B are on the southern border of the DeMontignys' property. At the time the DeMontignys purchased their 2 acres, the disputed acre was fenced on three sides. There was no fence between points A and B. The DeMontignys fenced that area and put gates in. The DeMontignys then grazed horses on the disputed acre. James DeMontigny testified that he did not obtain Pixel's permission to erect the fence or graze his horses and that he did not pay Pixel rent on the property.

During the time Pixel lived on the property, he did not use the disputed acre and never objected to the fact that the DeMontignys were grazing their horses on it. Pixel lived on his property until around 1969, when he rented the farmhouse to Vern Echternach. Echternach testified that someone else rented the farm ground.

Echternach lived in Pixel's farmhouse for approximately 16 or 17 years. During this time, Echternach kept a horse on the property, but he did not graze it on the disputed acre. Echternach testified that for as long as he has known the DeMontignys, they are the only ones who have occupied the disputed acre.

When Echternach moved out of the farmhouse, Fred Citta moved in and rented both the house and some of the land. Prior

to renting the house, Citta had rented and farmed different parcels of land in the area for approximately 15 years. Citta testified that he kept some sheep on the property, but he did not use the disputed acre, and that, at one point in time, he fixed one of the fences to keep his sheep out of that area. Citta never observed anyone besides the DeMontignys use the disputed acre. Citta testified that the Pixel property had several owners during the time he was renting.

In 1990, Frank Krejci, a real estate developer, purchased the Pixel property. Krejci subsequently transferred the property to his corporation, the plaintiff, F & J Enterprises, and planned to develop the property into an industrial park. In the spring of 1995, Krejci commenced grading the Pixel property and requested that the DeMontignys remove themselves from the disputed acre. Krejci testified that at this point, James DeMontigny informed him that Pixel had given the property to the DeMontignys. James DeMontigny testified that he could not recall telling Krejci this.

When the DeMontignys refused to vacate the disputed acre, F & J Enterprises filed the present lawsuit to quiet title to the property. The DeMontignys filed a cross-petition, alleging that they were the owners of the property by reason of adverse possession. A bench trial was held April 25, 1996. The trial court determined that the DeMontignys had been given permission to graze their horses on the property. The court further found that the DeMontignys failed to prove they held the land under a claim of ownership. The court accordingly held that the DeMontignys had failed to prove adverse possession and entered judgment in favor of F & J Enterprises. The DeMontignys now appeal that decision.

## ASSIGNMENT OF ERROR

The DeMontignys' six assigned errors can be restated as alleging that the trial court erred in quieting title in F & J Enterprises.

## STANDARD OF REVIEW

A quiet title action sounds in equity. *Gustin v. Scheele,* 250 Neb. 269, 549 N.W.2d 135 (1996); *Poppleton v. Village Realty Co.,* 248 Neb. 353, 535 N.W.2d 400 (1995).

In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Siffring Farms, Inc. v. Juranek*, 252 Neb. 150, 561 N.W.2d 203 (1997); *Gustin v. Scheele, supra.*

## DISCUSSION

In finding that the DeMontignys had failed to prove the necessary elements of adverse possession, the trial court stated:

> It appears that the [DeMontignys] owned a tract of land to the north of the questioned property, purchased in about 1963. The [DeMontignys] were given permission by the owner of the property in question to graze their horses on the property shortly thereafter their purchase and continued to use the property up to the time of the trial.
>
> There is no question that title to the property is in [F & J Enterprises]. In order for the [DeMontignys] to obtain title by adverse possession, they must show by the preponderance of the evidence that they were in actual, continuous exclusive, notorious and adverse possession under a claim of ownership for a full 10 year statutory period. <u>Thornburg v. Haecke</u>[r,] 243 Neb. 693, 502 N[.]W[.]2d 434 (1993).
>
> The [DeMontignys] used the land in question for numerous years, well over the 10 year period. They repaired and replaced fences on the property to keep the horses in. No one bothered them in the use of this property. They did not pay the taxes on the property. The [DeMontignys] fulfilled all the requisites except the evidence does not show adverse use under a claim of ownership. See <u>Bergl[u]nd v. Sisler</u>, 210 Neb. 258[,] 313 N[.]W[.]2d 679 (1981).

*If It Looks Like a Duck and Walks Like a Duck . . .*

█ One who claims title by adverse possession must prove by a preponderance of the evidence that he or she has been in actual, continuous, exclusive, notorious, and adverse possession

under claim of ownership for the full 10-year statutory period. *Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434 (1993).

> " 'Claim of right or of ownership mean hostile and these terms describe the same element of adverse possession. Ordinarily the intent with which the occupier possesses the land can best be determined by his acts and the nature of his possession. The statute of limitations will not run in favor of an occupant of real estate, unless the occupancy and possession are adverse to the true owner and with the intent and purpose of the occupant to assert his ownership of the property.' "

*Id.* at 699, 502 N.W.2d at 439.

> [A]dverse possession is founded upon the intent with which the occupant held possession and can best be determined by his acts. . . . " 'It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he takes possession. When, therefore, a claimant occupies the land of another by actual, open, exclusive, and continuous possession, the owner is placed on notice that his ownership is endangered and unless he takes proper action within 10 years to protect himself, he is barred from action thereafter and the title of the claimant is complete.' "

*Nebraska State Bank v. Gaddis*, 208 Neb. 136, 140-41, 302 N.W.2d 686, 689 (1981).

> "It can readily be seen that the intent with which the claimant first took possession of the disputed tract is not ordinarily of too much significance. The title of the true owner is lost by his inaction. It would seem, therefore, that when the possession of the land of another, no matter what the intention may have been in making the first entry, amounts to that which the law deems as adverse to the true owner and such possession continues for the statutory period of limitation of 10 years, the adverse holding ripens into ownership in the absence of explanatory circumstances affirmatively showing the contrary such as occupancy under a lease, an easement, or a permissive use. . . ."

*Svoboda v. Johnson*, 204 Neb. 57, 65, 281 N.W.2d 892, 898 (1979) (quoting *Purdum v. Sherman*, 163 Neb. 889, 81 N.W.2d

331 (1957)). See, also, *Dugan v. Jensen*, 244 Neb. 937, 942, 510 N.W.2d 313, 317 (1994) (observing "[g]enerally, if the occupier's physical actions on the land constitute visible and conspicuous evidence of the possession and use of the land, such acts will be sufficient to establish that the possession was actual and notorious"); *Barnes v. Milligan*, 196 Neb. 50, 241 N.W.2d 508 (1976).

*Nebraska State Bank v. Gaddis, supra*, was a boundary dispute case in which the defendant and her former husband took possession of land under the mistaken belief that the land was a part of their property. The trial court found that the defendant's former husband testified that he never intended to occupy more land than was purchased; that no open claim was made to the disputed tract; and that the record was devoid of any evidence tending to prove that the defendant possessed the disputed tract adversely, exclusively, notoriously, or actually. Accordingly, the trial court quieted title in the plaintiff. In reversing the decision of the trial court, the Nebraska Supreme Court observed:

> The record in the case now before us establishes that the defendant and her husband appropriated and used the disputed strip as their own, to the exclusion of all others. Their acts establish their intent and a claim of ownership which was adverse to the plaintiff. Adverse possession does not depend upon the remote motivations or purposes of the occupant nor upon whether his motivation is guilty or innocent. The evidence is uncontradicted that no one ever interfered with defendant's open, exclusive, and continuous possession and use of the disputed strip from 1955 until the plaintiff's contractor attempted to enter on the property in 1978.

208 Neb. at 141, 302 N.W.2d at 689.

Similarly, in the present case, the DeMontignys have been in actual, open, exclusive, and continuous possession of the disputed property for more than 30 years. The DeMontignys kept their horses on the land, repaired the fences, and mowed the grass. The DeMontignys never obtained permission to use the disputed acre, nor did they ever pay anyone rent. From 1963 until 1995, when Krejci asked the DeMontignys to remove themselves from the disputed acre, no one interfered with the

DeMontignys' use of the property. Accordingly, in the "absence of any explanatory circumstances," the DeMontignys' adverse holding has ripened into ownership. The presumption of adverse use and claim of right prevails unless it is overcome by a preponderance of the evidence. See, e.g., *Svoboda v. Johnson*, *supra*.

*Actions Speak Louder Than Words.*

F & J Enterprises does not take issue with this; however, F & J Enterprises argues, and the trial court found, that the DeMontignys did not occupy the land under a claim of ownership. In support of its position, F & J Enterprises relies extensively on the following testimony of James DeMontigny elicited on cross-examination:

Q. . . . Isn't it true, sir, that you have never made a claim of ownership to this property to anyone?

A. No.

. . . .

Q. You have never informed anyone or told anyone that this one acre in question is your property?

A. No.

. . . .

Q. Never made a claim of ownership to this property, correct?

A. No.

Q. Okay. When was the first time that you have claimed any interest in this property?

A. Well, after they started developing it, you know, and I was losing ground there pretty fast, and I had — I was informed that I could put a claim on the property, and so I did.

Q. Okay. Who informed you you could put a claim on the property?

A. Well, there was — I talked to people in the court-house and I talked to different attorneys and they said the same thing.

. . . .

Q. Okay. Prior to . . . 1995, isn't it true that you never claimed any interest in this property, —

A. No.

Q. — correct?

You never claimed any interest in the property, is that correct?

A. I just used it. I never claimed it, no.

Q. Never claimed ownership, correct?

A. Pardon?

Q. You never claimed ownership to this property, correct?

A. No.

Q. You were just using the property?

A. That's right.

Relying on *Hallowell v. Borchers,* 150 Neb. 322, 34 N.W.2d 404 (1948), the DeMontignys contend that "[w]ith reference to the testimony of the [DeMontignys] that they never made a claim of ownership to the one acre tract, the cases in Nebraska make it clear that not much importance has been placed upon such testimony in adverse possession cases." Brief for appellant at 15.

In *Hallowell,* the plaintiffs had purchased certain real property and mistakenly believed that some adjoining land, the disputed property, was within their property line. The plaintiffs plowed and cultivated this land, and the persons cultivating the adjoining land stopped planting and plowing at the claimed boundary lines. The plaintiffs subsequently erected a chicken house and a fence which enclosed a portion of the disputed land. The plaintiffs also planted trees along the claimed boundary line. Several witnesses testified that when friends visited, the plaintiffs showed them the boundaries of their land, inclusive of the disputed property. Some 15 years later, a survey was done and the plaintiffs learned that the true boundary lines did not include the disputed property. Both of the plaintiffs testified that prior to the survey, they believed that the disputed property was part of their purchased property.

After discovering that the plaintiffs had been using their land, the defendants informed the plaintiffs that the defendants were going to fence the property and suggested that if the plaintiffs had any trees to save, they needed to transplant them. The defendants further informed the plaintiffs that their chicken-

yard fence was on the defendants' property. The plaintiffs moved the fence.

The plaintiffs subsequently consulted with counsel and put the fence back in its original position. Counsel for the plaintiffs wrote the defendants a letter informing them that they had trespassed on the plaintiffs' land and caused damage thereon and requesting that they refrain from doing so in the future.

The defendants ignored this letter and cut down some of the plaintiffs' trees in preparation for the construction of their fence. The plaintiffs then brought suit to quiet title. The trial court quieted title in favor of the plaintiffs, and the defendants appealed. In affirming the decision of the trial court, the Supreme Court stated:

> With reference to the testimony of the defendants to the effect that the plaintiffs made no claim to any other land than to the true boundary line, and other evidence of similar import heretofore appearing in the opinion, we might well add that it is clear that *not too much importance should be attached to what an occupant may claim on the witness stand* on this point, particularly when it is apparent that his testimony is altogether inconsistent with his acts and conduct during the period of his possession. Any honest witness, unless coached by counsel, would be likely to answer a question as to whether he claimed more than to the true boundary in the negative, and would not be likely to think of qualifying it by stating that the true boundary of which he speaks is the boundary as appears to him to be the true one. Hence, while we do not want to go so far as to hold that such testimony should not be taken into consideration in determining the true facts of the case, it is clear that *to have a case depend entirely upon what might become a mere verbal quibble is dangerous and subversive of rights.*

(Emphasis supplied.) 150 Neb. at 333, 34 N.W.2d at 410.

> "In other words, it is the visible and adverse possession, with an intention to possess land occupied under a belief that it is the possessor's own, that constitutes its adverse character, and not the remote view or belief of the possessor. Or, as said in 1 R. C. L. 733, 'the mere fact of posses-

sion is allowed to override the intention; and it is held that a possession beyond the true boundary lines, irrespective of the intention with which it was taken, becomes adverse.'"

150 Neb. at 334, 34 N.W.2d at 411.

Similarly, in the present case, we do not believe that "too much importance" can be attributed to James DeMontigny's testimony that he "made" no claims of ownership to this land during the timeframe in which he possessed it. We reach this conclusion for several reasons. First, it is not altogether clear from that testimony just exactly how James DeMontigny interpreted the "making" of a claim or the "claiming" of ownership as those terms were used in the initial questioning. However, his later answers provide some insight. When asked to define the first time that he had "claimed" any interest in the property, James DeMontigny responded: "Well, after they started developing it, you know, and I was losing ground there pretty fast, and I had — I was informed that I could put a claim on the property, and so I did." When he was again asked to confirm that he "never claimed any interest in the property," he responded, "I just used it. I never claimed it, no." We believe these answers are strongly suggestive that, in James DeMontigny's mind, the *making* of a claim of ownership or the *claiming* of ownership involved some form of legal event such as the filing of a document, the placing of a monument, or the like. We believe this is precisely the type of "verbal quibble" that *Hallowell v. Borchers*, 150 Neb. 322, 34 N.W.2d 404 (1948), cautions not be entirely depended upon in resolving the "true facts of the case." In reality, the issue is not whether the DeMontignys *made* a claim, but whether they occupied the land with the intention of claiming ownership of it.

■ Second, we decline to place overriding import on James DeMontigny's words because it is apparent that his testimony is altogether inconsistent with his acts and conduct during the period of his possession. The DeMontignys' actions were consistent with those of owners. They maintained the fences, mowed the property, grazed their horses, and did not pay rent on the property or obtain anyone's permission to use the property. According to Krejci, when he challenged the DeMontignys'

ownership of the property, James DeMontigny informed Krejci that Pixel had given the property to the DeMontignys and that the DeMontignys owned the property. Prior to this time, there is no evidence that anyone ever challenged the DeMontignys' ownership of the property so as to prompt any overt "claim" of ownership to the property. The one and only time his ownership was challenged, James DeMontigny asserted his ownership positively and resolutely. Actual assertion of a claim of ownership is not necessary to prove adverse possession. See, e.g., *Nebraska State Bank v. Gaddis*, 208 Neb. 136, 302 N.W.2d 686 (1981).

F & J Enterprises urges us to conclude that the DeMontignys' acts show they did not occupy the land with the intent to claim ownership because, on several occasions, surveyors were on the land and the DeMontignys did not object to their presence or question or approach them in any fashion and because, when the Metropolitan Utilities District (MUD) installed a new waterline, the DeMontignys did not inform MUD employees that the DeMontignys owned the property. We do not find either event to be particularly persuasive on the issue. Although James DeMontigny admitted that he saw the surveyors on the land, there is no evidence that he felt ownership of it was threatened by their presence. While some may react to the presence of strangers on their property by threats, claims of trespass, and other verbal or physical protestation, we are not prepared to say that civility in the face of such intrusion is necessarily inconsistent with a claim of ownership. To the contrary, it may well be viewed as a sign of assured confidence that such claim of ownership is so open and obvious that verbalizing it would be redundant. The DeMontignys' response to the MUD employees' presence is a good example. At that time, the present lawsuit had already been filed and the DeMontignys were clearly claiming ownership, yet they did not protest MUD's presence.

## CONCLUSION

The DeMontignys proved that they were in actual, open, exclusive, and notorious possession for more than 30 years. The burden then fell on F & J Enterprises to prove by a preponderance of the evidence that the DeMontignys' use was not

adverse. F & J Enterprises failed to meet this burden. Accordingly, the trial court should have quieted title in the DeMontignys. The judgment of the trial court is reversed, and this cause is remanded with directions that the trial court enter judgment in favor of the DeMontignys on their cross-petition.

REVERSED AND REMANDED WITH DIRECTIONS.