# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-1870

———————

James Neff Kramper Family     *
Farm Partnership,     *
    *
          Appellant,     *
    *   Appeal from the United States
     v.     *   District Court for the
    *   District of Nebraska.
IBP, Inc.,     *
    *
          Appellee.     *

———————

Submitted: October 24, 2003
Filed: January 7, 2005

———————

Before BYE, HANSEN and MELLOY, Circuit Judges.

———————

BYE, Circuit Judge.

James Neff Kramper Family Farm Partnership (Kramper), a Nebraska landowner, is alleging IBP, Inc. trespassed on its farmland by placing an air monitoring device and groundwater well (collectively the monitoring station) six feet onto the land in question. The case originated in Nebraska state court and was removed to federal court by IBP.

Raising the issue of jurisdiction sua sponte, Boatmen's First Nat'l Bank of Kansas City v. Kan. Pub. Employees Ret. Sys., 57 F.3d 638, 640 n.4 (8th Cir. 1995), we conclude it "appears to a legal certainty that the claim is really for less than the

jurisdictional amount."  Kopp v. Kopp, 280 F.3d 883, 884 (8th Cir. 2002) (internal citations and quotations omitted).  We therefore lack jurisdiction, and have no choice but to remand it to the district court with directions to remand to state court pursuant to 28 U.S.C. § 1447(c).

I

In August of 2000, IBP placed the monitoring station in a Dakota County ditch adjacent to a county road known as C Avenue, first established in 1894.  The monitoring station measures approximately twelve square feet. In locating the monitoring station, IBP relied on the county's measurements of its right of way, which was determined to be thirty-three feet from the current center line of C Avenue. Kramper's claim arises from the fact that over time C Avenue has wandered slightly from the historical section line.  If the county's right of way is measured from the historical section line rather than from the center of the road, the monitoring station is six feet onto Kramper's land.

Kramper sued IBP in Nebraska state court alleging IBP trespassed on its land. Kramper did not allege an amount in controversy, but did file a claim with Dakota County over the same alleged trespass demanding compensation "in the amount of $275,000."  App. at 8.  In its notice of removal to federal court, IBP relied upon Kramper's $275,000 demand to the county as the basis for claiming the amount in controversy between itself and Kramper exceeded $75,000.  App. at 5.

After removing the case to federal court, IBP filed a motion for summary judgment.  The district court granted IBP's motion for summary judgment and dismissed Kramper's claim on two grounds.  First, interpreting scarce Nebraska law on the issue, the district court determined Dakota County's right of way should be measured from the current center line of C Avenue rather than from the historical section line, and thus no trespass occurred.  In the alternative, the district court

determined the amount of alleged damage was only $22.50, "not even one-sixth the filing fee necessary to commence an action in this Court," Add. at 8, and an insufficient amount to support an actionable trespass claim under Nebraska law. See Hallowell v. Borchers, 34 N.W.2d 404, 412 (Neb. 1948) (affirming a trial court's dismissal of a trespass claim where the "damage was of such trivial significance that no recovery should be had").

After Kramper appealed, we questioned whether the $275,000 amount originally alleged at the time of removal was legitimate. We do not assume the claimed amount is the actual amount in controversy if "the court questions whether the amount alleged is legitimate, [for then] the party invoking federal jurisdiction must prove the requisite amount by a preponderance of the evidence." Missouri ex rel. Pemiscot County v. W. Sur. Co., 51 F.3d 170, 173 (8th Cir. 1995) (citing McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). This rule applies even in a removed case where the party invoking jurisdiction is the defendant. See, e.g., In re Minn. Mut. Life Ins. Co. Sales Practices Litig., 346 F.3d 830, 834 (8th Cir. 2003) (applying the rule in a removed case).

We ordered the parties to submit supplemental briefing on the question of jurisdiction. The burden thereafter fell upon IBP, as the party invoking federal jurisdiction, to show by a preponderance of the evidence the claims originally asserted by Kramper could, that is might, legally satisfy the amount in controversy requirement. Kopp, 280 F.3d at 885. After reviewing the record in this case, as well as the parties' supplemental briefs, it is clear *no* evidence, much less a preponderance, supports the legitimacy of a claim exceeding $75,000. Thus, it is legally certain the claim is really for less than the jurisdictional amount, and the district court should have dismissed the federal action and remanded the case to state court rather than addressing the trespass claim on the merits. See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

II

It is undisputed the amount of land directly affected by the alleged trespass was 6' x 12' (or 1/605 of an acre). Kramper alleged it lost the use of that tract for three growing seasons. In the summary judgment proceedings before the district court, IBP presented expert testimony that the rental value of that amount of land was $7.50 per growing season. Kramper failed to offer any evidence to rebut IBP's expert testimony. Thus, it is undisputed the total damages for the land directly affected by the alleged trespass were at most $22.50. See Whitehead Oil Co. v. City of Lincoln, 515 N.W.2d 401, 411 (Neb. 1994) ("The appropriate measure of damages for the . . . landowner's loss [is the] injury to the property's potential for producing income or an expected profit.").

Kramper's claim of additional damage was based upon two factors. First, it alleged an infringement on ingress and egress, claiming the monitoring station blocked one field approach to the land (which consisted of 152½ acres) and thus disrupted its tenant's farming operation with respect to the entire field. The record refutes this claim. Even though the monitoring station allegedly blocked one field approach, Kramper's farm tenant testified he continued to enjoy access at all four corners of the property. App. at 139. Indeed, the monitoring station was located at the southeast corner of the field, and the tenant testified he could still access the field even at that corner. App. at 143. Thus, the allegedly blocked field approach had no effect on ingress and egress. Furthermore, the county offered to build a new field approach, which would have taken "at most a half an hour's worth of work of the motor grader [because] there was hardly no ditch there. You wouldn't have had to put [any] fill in." App. at 154. The photographs in the appendix support the county's claim, showing the "ditch" is essentially the same level as the adjacent county road, and that access to the land could have been gained almost anywhere along the "ditch" in issue. App. at 126-28. It was not as if Kramper's field was an impenetrable medieval castle surrounded by a moat, and IBP destroyed the only drawbridge.

The photos further discredit Kramper's claim that the monitoring station disrupted the tenant's farming operation. One photo shows the field edge of the monitoring station essentially on the same line as utility poles running down the ditch, but perhaps a foot or two closer to the field than the poles. The photo also shows corn planted in the field; the corn is the same distance away from the poles all along the edge of the field, that is, whoever planted the corn did not "swerve out" to avoid the monitoring station. App. at 126. In other words, the monitoring station caused no more disruption to the tenant's ability to farm the edge of the field than did the utility poles in the ditch, which were there before the monitoring station. There is simply no genuine factual dispute about whether the alleged trespass affected anything more than the sandbox-sized square of land actually covered by the monitoring station.

Second, Kramper claimed it was unable to sell its property at fair market value due to the existence of the groundwater well. As the district court noted, however, Kramper did not support this conclusory allegation with any actual facts, "such as the existence of a potential buyer, [Kramper's] readiness to sell, and the effect, if any, on any potential sale [after] the return of the well area to its natural condition following the abandonment of the well." Add. at 8. Kramper offered no evidence of the cost of removing the well. Nor did Kramper offer any evidence of the specific amount the presence of the well reduced the fair market value of the area of land actually affected by the well. Instead, Kramper relied solely upon its allegation the presence of the groundwater well damaged it "in the amount of $6,840,000.00," App. at 124, or the amount obtained by multiplying the entire acreage (152 acres) times Kramper's estimate of the commercial value of the land ($45,000 per acre).

The record – and common sense – clearly dispel any claim the groundwater well was a $6.8 million blemish on Kramper's land. Prior to the well's formal abandonment (which consisted of cutting off the pipe three feet below ground, capping it, and restoring the ground surface to its original condition), this

"impediment" consisted of about three feet of pipe sticking out of the ground. App. at 126. As noted, this "impediment" was on the very edge of the southeast corner of the 152-acre tract of land. A survey diagram in the record shows the pipe parallel to the nearest utility pole. App. at 33. Thus, above ground at least, common sense indicates the well would no more impede the sale of the land than would the line of poles running down the ditch. And while the underground presence of the well *might* damage Kramper to some minimal extent, neither Kramper or IBP offered any evidence as to how much the presence of the underground casing harmed Kramper or devalued the land.

## III

Just as there are no genuine factual disputes over the illegitimacy of the claimed amount in controversy, neither are there any legal reasons why a federal court should, or can, exercise jurisdiction over the merits of this dispute.

First, Kramper contends as a legal matter its damages claim is enhanced by virtue of the fact it asked for injunctive relief. Kramper's prayer for an injunction is not enough to give the federal courts diversity jurisdiction. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 347 (1977). "Likewise, in determining the jurisdictional amount in an action to prevent the continuing trespass on one's land, it is only the value to the part of land that will be destroyed without the injunction that is considered; the total value of the property is measured only if the entire value of plaintiff's property will be protected by the injunction." In re Fid. Bank Trust Fee Litig., 839 F. Supp. 318, 322 (E.D. Pa. 1993) (citing 14A Charles Wright et al., Federal Practice and Procedure § 3702, at 41 (2d ed. 1985)).

As discussed above, the amount of land directly affected by the alleged trespass was 6' x 12' (or 1/605 of an acre). That amount of land would be worth $74.38 if we accept Kramper's estimate of the commercial value of the land at $45,000 per acre. Thus, even if we assumed Kramper's injunctive relief would further entitle it to have the entire groundwater well removed – casing and all – the cost of that removal would have to exceed $74,925.62 in order to satisfy the amount in controversy requirement. Although common sense alone is enough to know the cost of entirely removing the well would never approach that amount, we do not have to rely on common sense. Where jurisdiction has been questioned, as it has in this case, someone has to prove the requisite amount by a preponderance of the evidence. Missouri ex rel. Pemiscot County, 51 F.3d at 173. As stated above, IBP did not present any evidence of the cost of removing the well.

Next, as the removing party who wants us to exercise federal jurisdiction, IBP contends this is a case where the alleged amount in controversy cannot fairly be challenged without evaluating the merits of the case. See Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969) (recognizing federal jurisdiction "where the issues relating to the amount in controversy [are] so commingled with the merits that final disposition [is] properly deferrable to the trial itself"). We disagree. Our analysis of the case assumes Kramper could prove its trespass claim on the merits, and only examines the legitimacy of the claim the alleged trespass might result in damages in excess of $75,000. "The jurisdictional fact . . . is not whether the damages *are* greater than the requisite amount, but whether a fact finder *might* legally conclude they are." Kopp, 280 F.3d at 885 (emphasis added). Here, even assuming Kramper can prove its trespass claim, a fact finder could not legally award damages approaching $75,000, even if other severance damages were considered, which they were not, because there is simply no competent evidence the damages were anything more than a nominal sum. If the merits required us to decide the difference in value between a sow's ear and a silk purse, but it is legally certain even the silk purse can never be valued at

$75,000, the merits are not so mixed with jurisdiction that we must defer final disposition. This is such a claim.

Finally, IBP claims what we know *now* about the illegitimacy of Kramper's damage claim does not defeat the presence of federal jurisdiction *at the time of removal*. That is incorrect. Although our jurisdictional inquiry focuses on the claims made at the time of removal, such that certain subsequent events – for example, the dismissal of one or more claims or parties – do not divest us of jurisdiction, we still judge the legitimacy of the amount in controversy "based on information known to the court at the time jurisdiction [is] challenged." Id. A mere allegation made at the beginning of the action is insufficient when, after extensive discovery, the amount in controversy is challenged. Missouri ex rel. Pemiscot County, 51 F.3d at 173-74. "[B]ecause the parties may not expand the limited jurisdiction of the federal courts by waiver or consent, we consider a challenge to subject matter jurisdiction even when first raised on appeal," In re Minn. Mut. Life Ins. Co. Sales Practices Litig., 346 F.3d at 834, and in some cases are obligated to raise the issue of jurisdiction sua sponte, Boatmen's, 57 F.3d at 640 n.4.

Here, we must consider the information known to us now, even though jurisdiction was never challenged in the district court. This is not a case where parties or claims were dismissed after the case was removed, the issue is still the full value of all claims originally made in the case. Such is the amount which is deficient for purposes of diversity jurisdiction, and if the legitimacy of the claimed amount in controversy had been challenged at the time of removal instead of now, it would have been found as lacking then as it is now.

IV

We have spent or spilled enough ink surrounding a dispute over $22.50. Although we have practical misgivings about the necessity of remanding such a

trivial matter to the state courts, our jurisdictional jurisprudence leaves us no other choice. Neither IBP nor this court can make a federal case out of this action by blindly relying upon Kramper's claim that a molehill is a mountain. For the reasons discussed, we lack jurisdiction and must send this case back to the district court with directions to remand it to state court pursuant to 28 U.S.C. § 1447(c).

_____