## NEVON DECASTRO, Appellee
## v.
## CATHERINE STUART AND ALL PERSONS CLAIMING AN
## INTEREST IN 173-C-76 ESTATE ANNA'S RETREAT, Appellant

Civ. App. No. 2001-20

District Court for the Virgin Islands

Division of St. Thomas

April 2, 2004

SHAWN E. MAYNARD-HAHNFELD, ESQ., St. Thomas, U.S.V.I., *for Appellant*

PETER T. SCHIRON, JR., ESQ., St. Thomas, U.S.V.I., *for Appellee*

FINCH, MOORE and CABRET, *Judges*

## MEMORANDUM OPINION

*Per curiam.*

## I. INTRODUCTION

Catherine Stuart appeals the trial court's decision that Nevon DeCastro acquired fee simple ownership of Parcel Number 173-C-76 Estate Anna's Retreat ["the property"] through adverse possession. This appeal presents two questions of first impression in the Virgin Islands:

1. Is a judgment against an adverse possessor, without additional action by the record owner to remove the adverse possessor, sufficient to interrupt the adverse possession?

2. Does a judgment against an adverse possessor permanently settle all questions of title and preclude the same individual from later acquiring title by adverse possession?

Additionally, this appeal requires us to consider

3. whether an adverse possessor's agreement with a record title holder to purchase the disputed property, coupled with the adverse possessor's part performance of that agreement, destroys the adverse possession period and gives the adverse possessor equitable title.

In addressing these three questions, we arrive at the following answers. First, a judgment against an adverse possessor is sufficient to interrupt adverse possession. Second, a judgment against an adverse possessor does not permanently settle all questions of title; instead, an adverse possessor who remains on the land for another full statutory period may acquire title to the land through adverse possession. Third, an adverse possessor's agreement to purchase the property from the record title holder gives the adverse possessor equitable title to the property. Applying these answers to the facts of the present case, we hold that DeCastro never satisfied the requirements of adverse possession for a fifteen year period, but he did acquire equitable title over the land in 1993 when he orally agreed to purchase it from its record owner and paid the record owner part of the agreed upon purchase price. We will reverse and remand the case to the trial court for proceedings consistent with these holdings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The issue presented by the parties is whether DeCastro acquired ownership over the property through adverse possession by occupying the property adversely for fifteen uninterrupted and continuous years. We focus our review of the facts accordingly.

The trial court found that DeCastro's adverse possession began in 1974, when he built a residence on the property consisting of four rooms with a concrete foundation, plumbing, electricity, telephone, and cable service. Also occurring in or about 1974 was the formation of an organization known as UJAMMA Organic Gardens, Inc. ["UJAMMA."] by DeCastro and other farmers in the area. Several UJAMMA members also staked claims to land near the property and the organization's members assisted each other in farming the land.

In 1973, Community Development Corporation purchased Estate Anna's Retreat subdivisions 173 A, B, and C. The property at issue here, Parcel Number 173-C-76, was eventually carved out from subdivision

173C. In 1978, Community Development's owner, William Farrington, told DeCastro and other members of UJAMMA to vacate the property. In 1979, after DeCastro and other UJAMMA members refused to leave, Community Development sued in the Territorial Court to eject them from the land. On May 1, 1980, the Territorial Court ruled that Community Development was the lawful owner of the property. On June 9, 1980, after Farrington obtained a Writ of Restitution,[1] Territorial Court Deputy Marshals and Farrington entered the property and the surrounding parcels with the goal of removing DeCastro and all other members of UJAMMA.

The parties dispute whether DeCastro was actually removed from the property on June 9, 1980, and whether he ceased living on the property after that date. Farrington testified at trial that everyone, including DeCastro, was removed from 173C Estate Anna's Retreat on June 9, 1980. In contrast, DeCastro testified that the Territorial Court Marshals did not remove him on June 9, 1980, and that he continued to reside on and farm the property. In support of his claim, DeCastro presented witnesses who testified that the Marshals had not interrupted DeCastro's presence on the property, and that DeCastro continued to reside on the property for many years after June 9, 1980. It is undisputed that DeCastro continued to be present on and around the property because Community Development hired him as an employee to construct and pave roads in the area. Although Farrington also worked on the property and surrounding areas during this time, he was not present on a daily basis and thus could not definitively state whether DeCastro was residing on the property.

In 1993, after Community Development completed work on the property and the surrounding parcels, a real estate broker working for

---

[1] At oral argument, the plaintiff correctly argued that a Writ of Restitution was not proper in this instance and that the trial court instead should have issued a Writ of Ejectment. A Writ of Restitution "is issued on the reversal of a judgment commanding the sheriff to restore to the defendant below the thing levied upon, if it has not been sold, and if it has been sold, the proceeds." BLACK'S LAW DICTIONARY 1611 (6th ed. 1990); see also 28A C.J.S. Restitution § 137 ("When a defendant, or even a stranger, has been wrongfully evicted under a writ, courts of equity in exercising their equity jurisdiction over the execution of writs of possession sometimes award a writ of restitution."). This error, however, does not change the fact that Community Development obtained a decree declaring it to be the owner of the land.

Community Development informed Farrington that DeCastro was still living in a house on the property. The trial judge found that Farrington confronted DeCastro and threatened to sue if DeCastro did not vacate or purchase the property. The trial court also found that DeCastro agreed to purchase the property for $20,000 and, on February 16, 1993, gave Farrington $5,000 as a down payment. DeCastro never paid the balance of the sale price and the sale was never completed.

On October 20, 1993, pursuant to a Writ of Execution resulting from a judgment entered against Farrington and his development companies, the Territorial Court Marshal conducted an auction to sell the property. Catherine Stuart purchased the property and later discovered DeCastro residing on it. Stuart served DeCastro with letters on August 1, 1995, and April 30, 1996, threatening legal action if DeCastro did not vacate the property, but Stuart never carried out her threat. On May 23, 1996, DeCastro sued Stuart in Territorial Court claiming that he had acquired title to the property through adverse possession. Stuart counter-claimed with a trespass action and a bench trial was held on May 15, 2000. In an opinion issued on December 29, 2000, the trial judge ruled that DeCastro had satisfied all the elements of an adverse possession claim and, therefore, he held title to the property. The trial court's reasons for reaching this ruling and each party's arguments on appeal are discussed below.

## II. ANALYSIS

### A. Standard of Review

This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all civil cases. V.I. CODE ANN. tit. 4, § 33.[2] Adverse possession claims are usually mixed questions of law and fact. 3 AM. JUR. 2D *Adverse Possession* § 321 (1986). Ordinarily, the fact finder determines the facts that bear on the issue of adverse possession. Whether those facts are sufficient to constitute adverse possession is a question of law for the court. *Id.* In reviewing the trial court's determination whether there was adverse possession, the Federal Rules

---

[2] *See* Revised Organic Act of 1954 § 23A; 48 U.S.C. § 1613a. The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1545 (1995 & Supp. 2003), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

of Civil Procedure provide that findings of fact made in a non-jury trial "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." FED. R. CIV. P. 52(a).[3] To the extent that an issue turns solely on application of legal precepts or statutory construction, this Court's review is plenary. *See Dennenberg v. Monsanto*, 168 F. Supp. 2d 494, 495 (D.V.I. App. Div. 2001); *Virgin Islands v. John*, 159 F. Supp. 2d 201, 205 (D.V.I. App. Div. 1999).

## B. Overview

Title 28, Section 11 of the Virgin Islands Code sets forth the following requirements for adverse possession:

> The uninterrupted, exclusive, actual, physical adverse, continuous, notorious·possession of real property under claim or color of title for 15 years or more shall be conclusively presumed to give title thereto, except as against the Government.

Stuart's appeal focuses on whether DeCastro maintained the "uninterrupted" and "hostile" elements for the required fifteen year period. Our analysis proceeds chronologically to determine if these elements were maintained for any fifteen year period. To the extent that the other elements are not called into question by this analysis, we find the trial court's decision was proper and affirm its decision on those elements without commentary.

## C. Did DeCastro occupy the property for fifteen uninterrupted and continuous years in a manner that satisfied the statutory requirements for adverse possession?

Stuart argues that three separate occurrences interrupted DeCastro's claim for adverse possession: (1) the May 1, 1980, Territorial Court order declaring Community Development the lawful owner of the property; (2) Farringtion's entry onto the property on June 9, 1980, accompanied by Territorial Court Deputy Marshals; and (3) DeCastro's

---

[3] The Federal Rules of Civil Procedure apply to proceedings in the Territorial Court, absent an express rule or provision to the contrary. "The practice and procedure of the Territorial Court shall be governed by the Rules of the Territorial Court and, to the extent not inconsistent therewith, by the ... Federal Rules of Civil Procedure." TERR. CT. R. 7.

February 16, 1993, agreement to purchase the property. We address each of these arguments in turn.

### 1. The May 1, 1980, Territorial Court Order

The trial court held that a judgment in favor of the true owner of a property is not sufficient to interrupt the continuity of adverse possession; instead, the trial court held that a record owner "who brings an action to recover the land must successfully complete the action to terminate the adverse possession." Stuart argues on appeal that "the legal authority of this and other jurisdictions clearly establish that ... when an action for restitution of property is successfully prosecuted to a final judgment, an adverse claimant's possession for statute of limitations purposes is clearly interrupted."

In contrast to Stuart's claim, the law of this jurisdiction does not clearly support the argument that such a court judgment interrupts the adverse possession. The only Virgin Islands case that touches on this issue does so only in a footnote that expressly gives no opinion on whether a favorable judgment interrupts an adverse possession claim, noting only that courts take various positions on the issue. *Andrews v. Nathaniel*, 42 V.I. 34, 40 n.5 (Terr. Ct. 2000). Given that there is no determinative Virgin Islands case law or statute, we look at the law of other jurisdictions in addressing this issue for the first time.[4]

Some courts hold that a judgment against the land occupier is not sufficient to stop the adverse possession period. *Rosenstihl v. Cherry*, 114 Ohio St. 401, 4 Ohio Law Abs. 226, 151 N.E. 642, 645 (1926) (a judgment against adverse possessor that was never enforced is not enough to interrupt adverse possession period because "[e]quity comes to the vigilant and not to those who slumber on their rights"); *Bellenger v. Whitt*, 208 Ala. 655, 95 So. 10, 11 (1922) (judgment against adverse possessor did not interrupt the continuity of his holding because the judgment was not enforced); *see also* 2 C.J.S. *Adverse Possession* § 192. Other courts take the opposite approach and hold a judgment against the land occupier is enough to break the adverse possession period. *See, e.g.,*

---

[4] Because the Virgin Islands adverse possession statute was modeled after Alaska's adverse possession statute, we would normally look first to Alaska case law for guidance. *See Tutein v. Daniels*, 10 V.I. 255 (D.V.I. 1973). Because our research found no Alaska case on point for the questions presented by this appeal, however, we look generally at other jurisdictions.

*Matthews v. Citizens' Bank of Senath*, 329 Mo. 556, 46 S.W.2d 161, 163-64 (1932) (a judgment which determines the title and right of possession in plaintiff's favor in and of itself changes the character of such possession from being adverse and stops the running of the statute of limitations); *Rosencrantz v. Shelds, Inc.*, 28 Md. App. 379, 346 A.2d 237, 246 (1975) (holding that the judgment in favor of record owner "carried with it constructive possession ... and wiped the slate clean of prior adverse possession."); *see also* 2 C.J.S. *Adverse Possession* § 192.

■ We believe that the latter line of cases represent the better approach because a court decision—as opposed to the physical acts of the litigants themselves—is the superior vehicle for determining whether the statutory requirements for adverse possession have been satisfied. To hold that adverse possession is not interrupted by a judicial decision against the adverse possessor would give more weight to the record owner's physical act of disposition than to the court's pronouncement. We thus rely on the Territorial Court's May 1, 1980 decree that Farrington was the owner of the property. We hold that this judicial decree interrupted DeCastro's adverse possession because it prevented DeCastro from holding the property "under claim or color of title" as required by the Virgin Islands Code.

■ We do not agree, however, with the law of some jurisdictions that such an adverse judgment permanently settles all questions of title, precluding later acquisition of title by adverse possession. *See, e.g., Creech v. Jenkins*, 276 Ky. 163, 123 S.W.2d 267, 269 (1938). Instead, we also hold that when a new and complete period of adverse possession runs in the claimant's favor after the date of the judicial decision against him or her, he or she will have acquired legal title notwithstanding the judgment. *See, e.g., Hodgkins v. People's Water Co.*, 177 Cal. 730, 171 P. 945, 945-47 (1918); *Power v. Jones*, 135 S.W.2d 1054, 1055 (Tex. Civ. App. 1940).

Applying these holdings to the facts of the current case, it is clear that DeCastro's adverse possession of the property was interrupted on May 1, 1980, when the Territorial Court decreed that Community Development was the lawful owner of the property, as well as on June 5, 1980, when the Territorial Court issued its Writ of Restitution. Thus, we now focus our inquiry on whether DeCastro occupied the land for a fifteen-year period after June 5, 1980.

### 2. Farrington's entry onto the property on June 9, 1980, accompanied by Territorial Court Deputy Marshals

The trial court heard evidence from both parties regarding Farringtion's June 9, 1980, entry onto the property accompanied by Territorial Court Deputy Marshals. This evidence led the trial judge to conclude that "the testimonial and documentary evidence did not conclusively demonstrate that an unmistakable ouster occurred or that the action to recover the land was successfully completed as against DeCastro." On appeal, Stuart argues that, contrary to the trial court's ruling, DeCastro was ousted from the property on June 9, 1980.

■ Upon review of the record, we agree that there is some factual evidence to support Stuart's claim that DeCastro was ousted on June 9, 1980. Yet, unlike the trial judge, we are in no position to evaluate the credibility of one set of witnesses against another and, under the clearly erroneous standard of review, will not overturn the trial judge's decision unless we are convinced a mistake has been made. *See United States v. Bogusz*, 43 F.3d 82, 85 (3d Cir. 1994). The trial judge heard the conflicting testimony from each side and decided to give greater weight to the testimony of DeCastro's witnesses in reaching its conclusion that DeCastro never relinquished possession of the property. Because we are not convinced this finding was clearly erroneous, we affirm the trial court's ruling that DeCastro never relinquished possession of the property and contentiously resided on the property through his filing for adverse possession in Territorial Court on May 23, 1996.

### 3. DeCastro's February 16, 1993, agreement to purchase the property

Next we consider the effect of DeCastro's February 16, 1993, agreement to purchase the property for $20,000 and down payment of $5,000. In analyzing the agreement, the trial judge relied on secondary sources which in turn rely on cases that hold the offer to purchase land or the purchase of land by an adverse possessor does not, by itself, interrupt the continuity of the adverse possession if the offer or purchase is made as a tactical move to avoid litigation. *See, e.g., Brylinski v. Cooper et al.*, 95 N.M. 580, 624 P.2d 522, 524 (1981); *Hallowell v. Borchers*, 150 Neb. 322, 34 N.W.2d 404, 409 (1948); *see also* 2 C.J.S. *Adverse Possession* § 186. Following this logic, the trial judge concluded that DeCastro

attempted to purchase the property merely to buy peace and avoid litigation. Finding that DeCastro was motivated by a desire to avoid litigation, the trial court held that his agreement with Farrington to purchase the property and his down payment of $5,000 did not interrupt the continuity of his adverse possession.

We, however, disagree with the trial court's decision to disregard the fact that DeCastro agreed to purchase the property from Farrington and partially performed that agreement. Instead, we hold that when Farrington agreed to sell the property and accepted part performance of that contract, Farrington (and all subsequent holders of his title to the property) lost the right in equity to remove DeCastro from the property. DeCastro thereby obtained equitable title to the property under the doctrine of equitable conversion. He no longer possessed the land under a mere claim or color of title but as the equitable owner with the right of possession and with the agreement and permission of the legal title holder. In short, DeCastro's possession of the property thereafter ceased to be adverse under 28 V.I.C. § 11.

■ The concept of equitable title and the doctrine of equitable conversion apply in the Virgin Islands to a contract to purchase land between the legal title holder and adverse possessor of that land. Equitable title describes the rights transferred to the purchaser under a contract for the sale of land, whereas equitable conversion relates more generally to the changed legal status of both the purchaser and title holder upon entering into the agreement. The equitable title is obtained as follows: "An unconditional contract for the sale of land, of which specific performance would be decreed, grants the purchaser equitable title, and equity considers him the owner." *Parr-Richmond Indus. Corp. v. Boyd*, 43 Cal. 2d 157, 272 P.2d 16, 22 (1954); *see also* 27A Am. Jur. 2d *Equitable Conversion* § 13. The doctrine of equitable conversion changes the legal relationship of the purchaser and seller as follows:

> [W]hen the Agreement of Sale is signed, the purchaser becomes the equitable or beneficial owner through the doctrine of equitable conversion. The vendor retains merely a security interest for the payment of the unpaid purchase money.

*DiDonato v. Reliance Standard Life Ins. Co.*, 433 Pa. 221, 249 A.2d 327, 329 (1969). In an installment land contract the deed to the land does not pass until payment is complete

The purchaser normally takes possession upon execution of the contract for deed and makes installment payments of principal and interest until the contract balance is fully satisfied. While the purchaser obtains equitable title upon execution of the contract, legal title is retained by the vendor until the final payment is made.

RESTATEMENT (THIRD) OF PROPERTY: *Mortgages* § 3.4 cmt. a (1996).[5]

■ Thus, when DeCastro paid and Farrington accepted $5,000 as a down payment on the $20,000 purchase price for the property under their oral land sale agreement, Farrington conveyed equitable title to land to DeCastro.[6] Farrington retained legal title as security to enforce payment of the remaining $15,000. *See, e.g., Ransom v. Marrazzo*, 848 F.2d 398, 407 (3d Cir. 1988) (stating that "the vendor retains a mere security for the payment of the unpaid purchase price"). While DeCastro still has equitable title to the property at issue,[7] Farrington's legal title and security interest in the land passed to the plaintiff, Catherine Stuart, at the judicial sale of the property on October 20, 1993. Accordingly, Stuart now holds the right to demand payment of the remaining $15,000 that DeCastro owes under the agreement. She may not oust DeCastro from

---

[5] The Territorial Court has observed that the doctrine of equitable conversion

recognizes that upon the formation of a contract for the sale of land, the seller and purchaser have an unconditional duty to perform in the future. Thus, it is the well settled doctrine of our courts of equity that, under a contract for the sale of lands, the purchaser becomes the equitable owner of the lands, and the seller the equitable owner of the purchase money.

*Griles v. Griles*, 39 V.I. 135, 140 (Terr. Ct. 1998) (internal citations and quotations omitted).

[6] Ordinarily, an oral contract for the sale of land such as this would violate the statute of frauds and be unenforceable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 110. DeCastro's part performance of the oral agreement, however, took it out of the statute of frauds and rendered it enforceable. *See Henderson v. Resevic*, 262 F. Supp. 36, 38-39, 6 V.I. 196 (D.V.I. 1966); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 138 cmt.c.

[7] The fact that Decastro has farmed and improved the property since the mid-1970s, together with the lack of evidence of inequitable conduct by DeCastro distinguishes this case from the wrongdoing that the Territorial Court found was present in *Griles*. In *Griles,* an equitable remedy was not required by justice because the attorney claiming equitable title had possibly attempted to hide his interest in the land in violation of the rules of professional conduct governing attorneys. *See* 39 V.I. at 139 n.5 (recognizing that Attorney Christian's conduct potentially violated several rules of professional conduct).

the property unless he fails to pay the balance plus nine percent interest and Stuart forecloses her security interest by judicial process.[8]

## III. CONCLUSION

We hold that DeCastro did not obtain title to the property through adverse possession, but that he does have a right in equity to enforce his agreement to purchase the property. In reaching this decision, we resolve two issues of first impression regarding adverse possession in the Virgin Islands. First, we hold that a judgment against an adverse possessor is sufficient to interrupt the period of adverse possession. Second, we hold that a judgment against an adverse possessor does not permanently settle all questions of title; instead, an adverse possessor who remains on the land for another full statutory period may acquire title of the land through adverse possession.

We also clarify the concept of equitable title and doctrine of equitable conversion in the Virgin Islands, holding that DeCastro obtained equitable title to the property by entering into a contractual agreement to purchase it and partially performing under that contract. Under the doctrine of equitable conversion, Farrington retained bare legal title as security to enforce payment of the balance due from the equitable title holder DeCastro. This legal title and security interest passed to Stuart at the judicial sale. Accordingly, we vacate the trial court's decision that DeCastro acquired fee simple ownership of Parcel Number 173-C-76 Estate Anna's Retreat through adverse possession and remand the case to the Territorial Court for proceedings consistent with this decision.

---

[8] Title 11, section § 951(a)(4) of the Virgin Islands Code provides that "the rate of interest shall be nine (9%) per centum per annum on money due or to become due where there is a contract and no rate is specified." Similarly, 11 V.I.C. § 951(a)(l) states that the rate of interest shall be nine percent on "all monies which have become due."